UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| Gary Perez and Matilde Torres, | |
| *Plaintiffs*, | |
| v. | Case No. 23-cv-977 |
| City of San Antonio, | |
| *Defendant*. | |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1.      This lawsuit seeks to stop the City of San Antonio (the "City") from desecrating a holy place. As members of the Lipan-Apache "Hoosh Chetzel" Native American Church, Plaintiffs Gary Perez and Matilde Torres believe that the land that includes Brackenridge Park (the "Park"), a 343-acre public park north of downtown San Antonio, is the site of the creation of life in this region. They and their ancestors have believed that long before the park existed, Plaintiffs use sites within the Park for both routine worship services and special religious ceremonies. The double crested-cormorant nests around a specific bend in the river within the Park that is central to Plaintiffs' beliefs about the creation of life and their spirituality. The birds' presence in the Park is essential for Plaintiffs' religious practice.

2.      Yet the City is pursuing a plan that is driving the birds away, destroying trees and other habitat, and compromising the Park's spiritual ecology, all of which is interfering with Plaintiffs' ability to practice their religion. On top of that, the City is preventing Plaintiffs from accessing their sacred area within the Park to worship according to their beliefs. On a half-dozen occasions, Plaintiffs asked the City to modify its renovation plans to preserve the ecology of the Park and Plaintiffs' ability to worship within it, but the City rejected those requests. Indeed, the

City has *never* undertaken basic steps to see whether the proposed development of the Park could go ahead in a way that would preserve the cormorant's presence or habitat.

3.      Plaintiffs now seek declaratory and injunctive relief to vindicate their rights protected by (1) the First Amendment of the U.S. Constitution, *see* U.S. Const. amend. I; (2) the Texas Constitution, *see* Tex. Const. art. I, §§ 6, 6-a; (3) the federal Religious Land Use and Institutionalized Persons Act ("RLUIPA"), *see* 42 U.S.C. § 2000cc, *et seq.*; and (4) the Texas Religious Freedom Restoration Act ("TRFRA"), Tex. Civ. Prac. & Rem. Code § 110.003(a), (b).

## PARTIES

### I.      Plaintiffs

4.      Plaintiff Gary Perez is a descendant of the indigenous people of North America, resident of the City, and member of the Lipan-Apache Native American Church. He serves as the principal chief and cultural preservation officer for the Pakahua/Coahuiltecan Peoples of Mexico and Texas and for the Indigenous Governors' office for the State of Coahuila Mexico. He has worshipped and led religious ceremonies in the Park for at least 25 years. Mr. Perez is also a published researcher who deciphered crucial elements of the Native American Church's theology and archaeology.

5.      Plaintiff Matilde Torres is a descendant of the indigenous people of North America, resident of the City, and member of the Lipan-Apache Native American Church and the Pakahua Peoples of Mexico and Texas. She has worshipped and participated in religious ceremonies in the Park for at least 10 years. She is a respected leader in her religious community, and regularly organizes, leads, and serves as a water bearer for religious services.

### II.      Defendants

6.      Defendant City of San Antonio is a municipal government entity in Bexar County, Texas, that is responsible for the policies developed and implemented through its officers,

employees, agents, and departments, including the Department of Parks and Recreation and the Historic Design and Review Commission.

## JURISDICTION AND VENUE

7.      This Court has federal question jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343 and 42 U.S.C. § 1983 because Plaintiffs allege violations of their rights under the United States Constitution and RLUIPA.

8.      This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

9.      This Court has authority to grant declaratory and injunctive relief pursuant to the Declaratory Judgment Act and this Court's equitable powers under 28 U.S.C. §§ 2201 and 2202. There is an actual controversy between Plaintiffs and the City within the Court's jurisdiction.

10.     Personal jurisdiction is proper because the City is physically located and maintains offices in this district. Furthermore, the City has intentionally and repeatedly transacted business or engaged in acts in this district that go to the heart of the matters at issue in this lawsuit, including its ongoing efforts to remove birds and trees and prevent Plaintiffs from accessing the Park. The City's officials, employees, agents, and departments are located in this district, including individuals whose actions are at issue in this Complaint. Thus, the City is subject to general and specific personal jurisdiction in this district.

11.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to Plaintiffs' claims occurred in this district.

## FACTUAL ALLEGATIONS

**I.      The Formation of Brackenridge Park**

12.     Indigenous peoples have lived on the land we now know as Texas for at least 16,000 years.[1]

13.     The first Spanish settlers arrived in San Antonio around 1535. In the late-1600s, Catholic missionaries from Europe arrived and encountered indigenous Payayan villages along the San Antonio River.

14.     During the Spanish colonization of San Antonio, a system of acequias (water channels) was built on lands that now comprise the Park to irrigate and provide potable water for the Spanish missions. These acequias functioned into the mid-1800s.

15.     The Park officially was established and began to assume its current form in 1899 when George Brackenridge donated 199 acres of land to the City. The City bought or received bequests of additional acreage over the next two decades, which expanded the Park to its current size of 343 acres.

16.     In the early twentieth century, various landmarks were built within the Park, including the San Antonio Zoo, the Japanese Tea Garden, the Witte Natural History Museum, and the Sunken Garden Theater. After 1950, few changes were made to the composition of the Park.

17.     None of these developments have prevented the religious practices of indigenous peoples who held the land sacred.

---

[1] *See, e.g.*, Thomas J. Williams *et al., Evidence of an early projectile point technology in North America at the Gault Site, Texas, USA*, 4 Science Advances, eaar5954 at 1 (July 11, 2018) ("The optically stimulated luminescence age estimates (~16 to 20 thousand years ago) indicate an early human occupation in North America before at least ~16 thousand years ago.").

18.     The Park is a Texas State Antiquities Landmark and is listed on the United States government's National Register of Historic Places. Upon information and belief, the State of Texas and United States government provide funding that is used to repair, enhance, maintain, and operate the Park. Upon information and belief, travel to the Park and commercial activity within the Park affects commerce with foreign nations, among the several states, or with Indian tribes.[2]

## II.     The Religious Significance of Brackenridge Park

19.     Although the Park contains historical structures dating back to the City's first Spanish settlements, the land within the Park has a much longer history. Plaintiffs and other groups indigenous to North and Central America believe the Park is where life was created in the region.

20.     According to their beliefs, the Park provides a special connection to the spiritual world. Plaintiffs and their fellow members of the Native American Church gather in the Park for personal and communal religious worship, following the traditions that their ancestors have observed for thousands of years. The shape of the San Antonio River within the park, the flora that surrounds the river, the constellations in the sky above—these come together to form a pilgrimage site for indigenous persons across North America. And they form one of the holiest sites on earth for Mr. Perez and Ms. Torres.

### A.     The Creation Story of the Native American Church

21.     According to Plaintiffs' beliefs and the Native American Church's teachings, the creation of life in the region began at a spring, now called Blue Hole spring, that sits just north of the Park.

---

[2] *See Brackenridge Park*, Visit San Antonio,
https://www.visitsanantonio.com/location/brackenridge-park/ (last accessed July 31, 2023).

22.     A spirit in the form of a blue panther lived in Blue Hole spring. Another spirit in the form of a double-crested cormorant flew into the Blue Hole spring and was chased away by the blue panther.

23.     As the cormorant fled from the spring, its tail feathers scattered life-giving water across the San Antonio River Valley, including the lands that comprise the Park, giving rise to life in this region.

24.     Members of the Native American Church and other people indigenous to North and Central America recognize the Park's religious significance by referring to it by the ancient name of the San Antonio River—Yanaguana—which means "spirit waters" in the Pakahuan language.

25.     The Park serves as the site for worship, critical religious ceremonies, and pilgrimages for Native American Church members and other indigenous religious groups.

**B.      The Spiritual Ecology of Brackenridge Park**

26.     For Plaintiffs, three points of reference establish a sacred space: underworld, middle world, and upper world. The underworld is seen in water, night, and darkness. The middle world surrounds us as we walk about the earth. The upper world is seen in the sky and stars.

27.     All three worlds are connected and experienced together through ceremonies performed in the Park by members of the Native American Church across the continent: for example, as explained in more detail below, in the Midnight Water ceremony, a celebrant views a reflection of the double-crested cormorant in the river (underworld), while surrounded by the bird on land and in the trees (middle world), underneath the stars that make up constellations reflecting the Yanaguana and the cormorant (upperworld). The presence and connection of these three worlds establishes a "spiritual ecology" that enables Plaintiffs to identify themselves in the physical world

and commune with the spiritual world. Many of the Native American Church's offerings, services, and ceremonies center around experiencing the three worlds together to locate oneself.

28.    The sanctity of the Park is intimately connected to the spiritual ecology of the three worlds and the various connection points (*e.g.*, river, trees, birds) that are present there. Harming any one of the connection points disturbs the sanctity of the Park and its capacity to function as a sacred space for Plaintiffs' religious practice. Completely removing the double-crested cormorant from the ceremony creates a type of spiritual crisis for adherents.

**C.    The Park's Cosmological Significance to the Native American Church**

29.    Within the Park, an area called Lambert Beach juts out into the San Antonio River along Brackenridge Drive and north of Tuleta Drive.

30.    The shape of the riverbend located at Lambert Beach mirrors, and Plaintiffs believe is spiritually connected to, a constellation of stars in the southern celestial hemisphere commonly known as Eridanus, which is often depicted as a celestial river flowing from the waters of Aquarius.

31.    The image below shows the similarity between the riverbend at Lambert Beach and the Eridanus constellation:



Figure 1 – This image compares the shape of the constellation Eridanus to the bend of the San Antonio River that is located in the Park.

32.     According to Plaintiffs' beliefs, this connection between the riverbend and the constellation enables a bridge to open in the Park between the physical and the spiritual worlds. This connection is most visible during the winter solstice, when Eridanus and the San Antonio River are physically aligned, although the location maintains its spiritual significance and power year-round.

33.     During the winter solstice, members of the Native American Church throughout North America and other indigenous persons perform a religious ceremony called "Midnight Water."

34.     As part of this ceremony, participants gather in the Park at the riverbend to touch the San Antonio River with cormorant tail feathers and scatter droplets of water. They also gaze into the water to see the spirit animal—the cormorant—in the underworld, while seeing themselves in the reflection, under the stars in the sky for that particular place and time.

35.     For Plaintiffs and other members of the Native American Church, their sacred area within the Park is where the Midnight Waters ceremony and other religious rites should be performed.

**D.     The Park's Historic Significance as a Holy Place and Pilgrimage Site**

36.     Members of the Native American Church and other indigenous groups have long revered and visited the Park to stand in its holy places, experience the spiritual ecology that exists there, and perform religious rites.

37.     Archeological evidence shows that indigenous peoples have honored the San Antonio River, and the springs that feed it, for millennia. For instance, the White Shaman Mural—a 26-foot rock art painting that was discovered on the walls above the Lower Pecos River and that

dates back at least 2,500 years—portrays religious ceremonies of ancient indigenous peoples that occurred there.

38.     The image below shows the White Shaman Mural.



Figure 2- The White Shaman Mural.[3]

39.     Archaeologists and scholars have studied the White Shaman Mural for decades and identified Mesoamerican iconography in it.

40.     In collaboration with archeologists and experts, Mr. Perez used Geographical Information Systems ("G.I.S.") to match iconography in the White Shaman Mural rock art to geological features in the Texas landscape, including the Blue Hole spring and other parts of the San Antonio River system. This is displayed in the two figures below.

---

[3] This image of the White Shaman Mural has been digitally enhanced for ease of review.



Figure 3 – This figure isolates iconography within the White Shaman Mural that has been shown to correspond with springs within the San Antonio River system.



Figure 4 – This figure shows a G.I.S overlay of the iconography that is isolated in Figure 3 onto a geographical map of the San Antonio River system.

41.    Today, peyote pilgrims follow the same path as depicted in the White Shaman Mural by stopping at each of the four springs. The Park is the final stop on this route. Pilgrims visit each of the four springs and perform a religious ceremony before continuing on their journey south to the peyote gardens.

42.     Mr. Perez also has matched iconography in the White Shaman Mural with the Eridanus constellation that, as discussed above, is connected to the bend of the San Antonio River located in the Park.[4] This is displayed in the two figures below.



Figure 5 – This figure isolates iconography within the White Shaman Mural that corresponds with key springs that feed the San Antonio River system.



Figure 6 – This figure compares the iconography that is isolated in Figure 5 with the Eridanus constellation that is connected to the bend of the San Antonio River located in the Park.

---

[4] Mr. Perez published these findings in the Bulletin of the Texas Archaeological Society. *See* Eric A. Schroeder, Gary R. Perez, and Joe R. Tellez, *Written on Stone and Practiced on the Landscape: Pre-contact Native American Cosmovision and the Sacred Landscape of the Edwards Plateau*, 93 Bulletin of the Texas Archeological Society (2022).

43.     The San Antonio River—and lands within the Park—are key religious sites for Plaintiffs and their fellow members of the Native American Church, as well as other indigenous people across Texas, the American Southwest, and Mexico.

44.     Plaintiffs' religious beliefs and practices are a continuation and outgrowth of the ancient practices depicted in the White Shaman Mural rock art that were practiced along the San Antonio River thousands of years ago.

III.    **The Bond Project**

A.      **The Park Deteriorates from Neglect**

45.     Brackenridge Park has long been a cherished place for San Antonians. Concern about the future of the park led to the formation of the Brackenridge Park Conservancy, a 501(c)(3) nonprofit, in 2008.

46.     The Park's natural environment has ailed for many years and remains vulnerable today. Much of the Park's flora is unhealthy, overgrown, or threatened by invasive species. For instance, the natural groundcover and diverse vegetative buffers that should exist under the trees and throughout the Park are almost entirely gone.

47.     Many of the Park's waterways are stagnant, algae prone, clogged with plant material, or buried altogether. The riverbanks within the Park are largely bare and eroded.

B.      **San Antonio Residents Vote to Make Improvements to the Park**

48.     On May 6, 2017, San Antonio voters approved an $850 million bond package to fund numerous public improvements throughout the City, including streets, bridges, flood control infrastructure, libraries, parks, cultural facilities, and public safety buildings.

49.     Most relevant here, the voters approved Proposition 3, which proposed to raise approximately $187 million for "Parks, Recreation, and Open Space Improvements" and

contemplated $7,750,000 for general improvements and rehabilitation to the Park, including repairs or enhancements to restrooms, trails, and historic river walls and other structures.

50.     That bond proposition made no mention of the religious interests at stake involving the San Antonio River or the Park. Nor did it specify the destruction of heritage trees or the double-crested cormorant's habitat.

### C.      The City Develops the Bond Project

51.     After voters passed Proposition 3, the City began developing the Brackenridge Park 2017 Bond Project (the "Bond Project"), which aims to establish how the City will use appropriated funds to make changes in the Park.

52.     Six years and multiple iterations later, the Bond Project has still not been implemented at Brackenridge Park, largely due to intense public opposition to the Bond Project's plan to destroy flora, including heritage trees, in the Park.

53.     Time and again, San Antonians objected to the City's development proposals in public hearings. One of the original proposals for the Bond Project called for removal of 105 trees, including many heritage trees. Such destruction of the Park's trees would drastically alter the face of the Park and decimate the spiritual ecology that exists there and is so critical to Plaintiffs' religious practice. Plaintiffs are unaware of any report the City commissioned to determine how the project could be designed if tree preservation were prioritized. Indeed, Plaintiffs are unaware of any studies or proposals the City created to reduce the harm to their religious practice, despite Plaintiffs' voicing those concerns formally and informally on numerous occasions.

54.     Another flash point in the Bond Project's development and execution has been the City's treatment of birds within the Park. As the City's plans for the Bond Project began to coalesce, it began driving migratory birds out the Park by removing them, placing obstructions in

trees to prevent nesting, shooting "blanks" from firearms, placing a car alarm in their nesting area, and otherwise making the Park uninhabitable for them.

55.     Euphemistically called "bird deterrence" or "bird mitigation," the City's Bond Project involves shooting pellets and pyrotechnic devices, such as "bird bangers," at the birds. City employees or agents also use noisemakers to harass the birds in the hopes of deterring them from nesting within the Park. The City's "bird deterrence" techniques also include tree pruning, removing nests, mylar balloons and streamers in trees, predator and distress noises, lasers, clapper boards, and pyrotechnics.

56.     These "bird deterrence" measures are largely aimed at preventing the double-crested cormorant from nesting in the Park. On information and belief, the City knows that under its Migratory Bird Act obligations, it cannot remove birds in the process of nesting or trees housing those birds. Accordingly, it aims to prevent nesting before it can begin.

57.     Based on the City's latest proposal for the Bond Project, the City plans to continue "bird deterrence" efforts throughout the Park and to destroy or relocate 98 trees.

58.     These plans would devastate the Park's spiritual ecology by driving away birds and cutting down significant numbers of mature trees so that the City can repair secular historic features, including: a colonial canal, a pump house, a limestone wall along the riverbank, and a sculpture garden.

59.     On information and belief, the City has never commissioned a study to determine if the Bond Project could be completed if the priority was ensuring the double-crested cormorant could inhabit the park afterwards. On information and belief, the City has never commissioned a study that aims to achieve its governmental purposes while accommodating Plaintiffs' religious exercise.

**D.      The City Rejects Less Destructive Engineering Solutions for the Bond Project**

60.      The City was presented with at least three engineering solutions for the Bond Project: two that preserve the majority of tree and bird life but that the City rejected due to cost considerations, and a third—which the City ultimately chose—that requires extensive excavation necessitating significant loss of tree and bird life.

61.      One engineering solution that the City rejected involves adding one or more concrete walls and piers to support the river walls. This solution minimizes the destruction of trees and the disruption to bird life in the Park, and the City has used it at other locations along the San Antonio River. On information and belief, certain engineers hired by the City proposed that this solution be used for the Park, but the City rejected it due to costs. On information and belief, a resident of San Antonio who is a structural engineer by trade offered to cover the additional cost that the City would incur to implement this alternative engineering solution, but the City refused.

62.      A second engineering solution that the City rejected involves using a pier and spandrel system with drilled helical piers to fortify the river walls. This solution also requires little intrusion into the riverbank and will allow new canopy trees to grow on the riverbank to replace any removed trees. On information and belief, a San Antonio resident and structural engineer, different from the one who proposed the first solution described above, proposed this engineering solution, but the City refused to adopt this approach as well.

63.      On information and belief, the City did not perform detailed studies or reviews of either the first or second engineering approaches that would save additional trees, birds, and habitat that is part of the Park's spiritual ecology.

64.      The third engineering solution, which the City chose, involves a cantilever system that necessitates significant excavation to construct anchors that can be attached as support to the

river walls. This requires excavation of trees and other plant material along the river walls and will destroy many more trees than the two rejected engineering solutions. In the long run, it will also prevent trees with large canopies from growing at or near the San Antonio River bank.

65.    The City's preferred solution is harmful not just to the trees but also to the birds that nest in them. Trees close to the riverbank are ideal roosting locations for the birds within the Park's rookery. The City's current engineering plan, therefore, causes the most damage to the largest number of trees and birds of the known available alternatives. It is the most damaging proposal to the Park's spiritual ecology of all the options that have been proposed to achieve the City's stated objectives.

66.    Many more trees and birds could be saved if the City would agree to alter its current engineering approach to reinforcing river walls and other infrastructure. But the City has refused to alter its plans in a way that would protect additional birds and trees.

67.    The City has been aware that the Project would violate Plaintiffs' religious rights since at least July 29, 2022, when Mr. Perez presented the Department of Parks and Recreation with his religious beliefs and practices. Plaintiffs sent the City a detailed demand letter, outlining the relevant facts and law, on May 23, 2023. Despite this, and despite specific requests for the City to undertake a study to determine how Plaintiffs' religious exercise could be accommodated, the City has refused to commission a design firm tasked with creating a plan that would preserve the walls *and* the double-crested cormorant's presence and habitat. And the plan approved by the City Council on August 3, 2023 included no improvements to the religious harms present in the prior plan—no improvements for tree preservation, no improvements for cormorant habitat, and no improvements for Plaintiffs' physical access.

**IV.    The City Prevents Plaintiffs from Accessing Holy Sites While it Develops the Bond Project**

68.     From approximately February 3, 2023, to the present, the City has prevented Plaintiffs from accessing the Park to engage in communal or individual worship. Plaintiffs are unable to enter sacred locations within the Park to perform religious ceremonies or connect with the Park's spiritual ecology.

69.     Much like Christian adherents may enter a church for private worship outside of scheduled sermons or liturgy, the Park is a critical site for the Native American Church's routine worship. Plaintiffs require general access to the Park for prayer, fellowship, and religious education, which are all critical to and compelled by their religious belief.

70.     In addition, given their importance as pilgrimage sites, Mr. Perez and Ms. Torres regularly act as religious leaders and guides to individuals who have traveled to the Park, often unannounced. Their inability to minister to those pilgrims while the sacred locations are fenced off prevents them from exercising their religion. Plaintiffs are also often presented with requests from local adherents, such as a birthday blessing, that they are unable to perform at the desired location of the sacred riverbend.

71.     If Plaintiffs are denied access to the Park or its spiritual ecology is damaged, then they will be unable to practice their religion and forced to significantly alter their religious practice forever.

72.     On or about August 12, 2023, members of the Native American Church plan to have a water offering ceremony at the Park. This ceremony requires the presence of the trees and the double-crested cormorant. Indeed, the ceremony is being performed, in part, to atone for the harm presently being done to the double-crested cormorants in the Park.

17

73.     On July 26, 2023, Plaintiffs requested access to their sacred area within the Park—which is currently blockaded by the City with temporary fencing—to perform the August 12, 2023 water offering.  The City initially responded on August 3, 2023, stating that it could accommodate Plaintiffs' request. But that "accommodation" consisted of allowing Plaintiffs access to a *different* part of the Park that was already open to the public. After Plaintiffs reiterated that they wished to access their sacred area within the Park, which is currently not accessible to the public, the City refused to grant the Plaintiffs' request to perform their ceremony in the Park on August 12, 2023.

74.     On information and belief, the City plans to prevent Plaintiffs and other members of the Native American Church from accessing the Park during future ceremonies, including during the autumn equinox, the Leonids meteor shower (November 17-18), and the winter solstice, in addition to ceremonies that arise without forewarning.

## V.     The City's Current and Planned Action Pursuant to the Bond Project Substantially Burdens Plaintiffs' Religious Exercise

75.     If the Bond Project and related bird deterrence efforts are left unabated, Plaintiffs will be unable to practice their religion and forced to significantly alter their religious practice.

76.     The Bond Project imposes a substantial burden on Plaintiffs' religious exercise because it authorizes destruction of flora and fauna that make the Park a sacred, religious site for Plaintiffs and other members of the Native American Church. The double-crested cormorant's presence, in particular, is essential to the Plaintiffs' religious services. The City is also denying Plaintiffs access to the Park.

77.     Perez and Torres have participated in routine worship and special ceremonies within the Park. Both would worship and perform important religious ceremonies in the Park now if the City would stop preventing them from entering the Park and experiencing the unique spiritual ecology that exists there.

78.     Due to the City's refusal to permit them access to the Park, Plaintiffs have been forced to modify their religious practice and even forgo certain critical religious exercises altogether.

79.     Furthermore, if implemented, the Bond Project would render certain of Plaintiffs' core religious practices impossible by destroying the spiritual ecology that must exist in the Park where certain ceremonies must be performed.

80.     If the City moves forward with its plan to remove so many trees and birds from the Park, the burden on Plaintiffs' religious practice will be far more than "substantial;" it will be devastating.

## VI.     The City Refuses to Consider Narrowly Tailored Alternatives

81.     Plaintiffs informed the City that the Bond Project infringes on their religious beliefs on multiple occasions. Plaintiff Gary Perez spoke and gave a presentation to the Department of Parks and Recreation on July 29, 2022. Brackenridge Park Conservancy invited Plaintiff Gary Perez to give a presentation about issues with the Bond Project at its January 10, 2023 meeting. Plaintiffs testified at the March 3, 2023 Texas Historical Commission meeting, the April 19, 2023 Historic Design and Review Commission hearing (along with counsel), and the August 3, 2023 City Council hearing (along with a written objection from counsel).

82.     On May 23, 2023, Plaintiffs sent a letter to the City explaining the effects of the City's current and proposed actions on the Park and Plaintiffs' religious exercise. Plaintiffs asked the City to halt actions that would damage the Park's spiritual ecology any further and requested that the City find a way to achieve its goals while still allowing Plaintiffs their religious practice.

83.     When presented with the facts alleged in this complaint, the City said it did not know about the historical and religious significance of the Park to Plaintiffs and numerous indigenous groups in Texas and across the United States. The City also acknowledged that it had

failed to consider Plaintiffs' religious liberty interests during its consideration and design of the Bond Project. The City nevertheless refused to stop or amend any of its actions or plans related to the Park. The plan approved by the City Council is materially identical in relevant respects to the plan as it existed when the City purported to be unaware of Plaintiffs' religious objections.

84.     Despite raising their objection at numerous hearings and meetings with the Brackenridge Park Conservancy, Mr. Perez and Ms. Torres are still unaware of any design proposal from the City that aimed to preserve the presence of the double-crested cormorant and maximize the number of trees while still achieving the City's stated interests in the Park.

85.     The City's treatment of Mr. Perez's and Ms. Torres's religious exercise can be contrasted with how the City treats its favored causes. The City has stated that its interest in developing the Bond Project is the historical preservation of Lambert Beach; the City has made clear it affords no such value to Plaintiffs' religious exercise, despite it representing a far older history than the Park's hundred-year-old walls. Likewise, just this decade a San Antonio highway project increased its budget by $30 million dollars to build an overpass, instead of an underpass, to preserve a spider protected by the Endangered Species Act.[5]

86.     Likewise with the City's "bird deterrence," the City purports to act pursuant to the Migratory Bird Act, while not attempting to accommodate Plaintiffs constitutional and statutory religious freedom rights. The City is willing to adjust its plans under its favored causes—like the protection of spiders—but not to protect the rights of its citizens.

---

[5] *See* John MacCormack, *Habitat plan aims to protect endangered species*, San Antonio Express-News (Nov. 15, 2014), https://www.expressnews.com/news/local/article/Habitat-plan-aims-to-protect-endangered-species-5895373.php.

## CLAIMS FOR RELIEF

### Count I

**Violation of the First Amendment to the United States Constitution: Free Exercise Clause –**
**(42 U.S.C. § 1983)**

87.     Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

88.     Plaintiffs have sincere religious beliefs and practices that originate and are related to the land on which the Park now sits. Plaintiffs' performance and compliance with these beliefs is a religious exercise.

89.     Through the Bond Project, the City is obliterating Plaintiffs' ability to practice their religion. By refusing Plaintiffs access to the Park, the City makes it impossible for them to practice core aspects of their religion. And by destroying trees and driving away birds from the Park, the City degrades and risks permanently destroying a sacred place for Plaintiffs, which would make core aspects of their religious practice impossible to perform.

90.     The Bond Project is not neutral or generally applicable. The City has engaged in preferential treatment for secular values and activities that it has refused to Plaintiffs' religious exercise. Namely, the City seeks to preserve more-recent historical structures, such as walls, while destroying far-more-ancient historical fixtures that are sacred to Plaintiffs. Likewise, the City has undertaken significant plan alterations to preserve animal presence when those animals were valued under secular statutes such as the Endangered Species Act or Migratory Bird Treaty Act.

91.     The City's current and proposed conduct causes Plaintiffs to suffer a special disability on the basis of their minority religion status and especially burdens their religious exercise in the Park.

92.     The City has no compelling interest for designing or implementing the Bond Project as it is currently iterated, for preventing Plaintiffs from accessing the Park, or for failing to

accommodate Plaintiffs' religious exercise. When pressed, the City has asserted interests in aesthetics, historic preservation, and a vague conception of public safety focused on crumbling riverbank walls and falling trees.

93.     The Bond Project is not narrowly tailored to achieve any compelling interest that the City may have for implementing it. Furthermore, the City refused to consider or implement alternatives that would accomplish the City's stated interest in the Bond Project while also preserving Plaintiffs' religious liberty rights. In fact, the City has never undertaken a study to see whether the development could proceed in a manner that protects the double-crested cormorant, whose presence is essential for Plaintiffs' religious exercise.

94.     Absent injunctive and declaratory relief against the City with respect to Plaintiffs' rights under the Free Exercise Clause of the First Amendment, Plaintiffs have and will continue to be imminently and irreparably harmed.

## Count II

### Violation of the Religious Land Use and Institutionalized Persons Act ("RLUIPA")

95.     Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

96.     Plaintiffs have sincere religious beliefs and practices that originate and are related to the land where the Park now sits. Plaintiffs' performance and compliance with these beliefs is a religious exercise.

97.     The City's conduct affects commerce with foreign nations, among the several states, or with Indian tribes. Indigenous people across Texas, the American Southwest, and Mexico travel to the Park in order to worship and perform religious ceremonies. The City advertises Brackenridge Park to out-of-state tourists as a reason to visit San Antonio.

98.     Upon information and belief, the City received federal financial assistance that is used to repair, enhance, maintain, and operate the Park. Upon information and belief, federal funds have or will be used related to the Bond Project.

99.     The City has developed and implemented land use regulations in the Park in a manner that imposes a substantial burden on Plaintiffs' religious exercise.

100.    Through the Bond Project, the City is obliterating Plaintiffs' ability to practice their religion. By refusing Plaintiffs access to the Park, the City makes it impossible for them to practice core aspects of their religion. And by destroying trees and driving away birds from the Park, the City degrades and risks permanently destroying a sacred place for Plaintiffs, which would make core aspects of their religious practice impossible to perform. This places a substantial burden on Plaintiffs' exercise of their religion.

101.    The City's current and proposed conduct causes Plaintiffs to suffer a special disability on the basis of their minority religion status and especially burdens their religious exercise in the Park.

102.    The City has no compelling interest for designing or implementing the Bond Project as it is currently iterated, for preventing Plaintiffs from accessing the Park, or for failing to accommodate Plaintiffs' religious exercise. When pressed, the City has asserted interests in aesthetics, historic preservation, and a vague conception of public safety focused on crumbling riverbank walls and falling trees.

103.    The Bond Project is not narrowly tailored to achieve any compelling interest that the City may have for implementing it. Furthermore, the City refused to consider or implement alternatives that would accomplish the City's stated interest in the Bond Project while also preserving Plaintiffs' religious liberty rights.

104.     Absent injunctive and declaratory relief against the City with respect to Plaintiffs'

rights under RLUIPA, Plaintiffs have and will continue to be imminently and irreparably harmed.

**Count III**

**Violation of Article I, Section 6 of the Texas Constitution**

105.     Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

106.     Plaintiffs have sincere religious beliefs and practices that originate and are related

to the land where the Park now sits. Plaintiffs' performance and compliance with these beliefs is a

religious exercise.

107.     Through the Bond Project, the City is obliterating Plaintiffs' ability to practice their

religion. By refusing Plaintiffs access to the Park, the City makes it impossible for them to practice

core aspects of their religion. And by destroying trees and driving away birds from the Park, the

City degrades and risks permanently destroying a sacred place for Plaintiffs, which would make

core aspects of their religious practice impossible to perform. This places a substantial burden on

Plaintiffs' exercise of their religion.

108.     The City's current and proposed conduct causes Plaintiffs to suffer a special

disability on the basis of their minority religion status and especially burdens their religious

exercise in the Park.

109.     The City has no compelling interest for designing or implementing the Bond Project

as it is currently iterated, for preventing Plaintiffs from accessing the Park, or for failing to

accommodate Plaintiffs' religious exercise. When pressed, the City has asserted interests in

aesthetics, historic preservation, and a vague conception of public safety focused on crumbling

riverbank walls and falling trees.

110.     The Bond Project is not narrowly tailored to achieve any compelling interest that

the City may have for implementing it. Furthermore, the City refused to consider or implement

alternatives that would accomplish the City's stated interest in the Bond Project while also preserving Plaintiffs' religious liberty rights.

111.   Absent injunctive and declaratory relief against the City with respect to Plaintiffs' rights under Article I, Section 6 of the Texas Constitution, Plaintiffs have and will continue to be imminently and irreparably harmed.

## Count IV

### Violation of Article I, Section 6-a of the Texas Constitution

112.   Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

113.   Plaintiffs have sincere religious beliefs and practices that originate and are related to the land where the Park now sits. Plaintiffs' performance and compliance with these beliefs is a religious exercise.

114.   Plaintiffs wish to conduct religious services in the Park. The City's physical barriers that prevent entry to their sacred space limit Plaintiffs' ability to conduct religious services.

115.   Plaintiffs' religious services require the presence of double-crested cormorants, which nest in the trees surrounding the San Antonio River. The City's "bird deterrence" measures limit Plaintiffs' ability conduct their religious services.

116.   The Bond Project, which will destroy the habitat for the double-crested cormorant, will destroy, and therefore prohibit or limit, Plaintiffs' ability to conduct religious services in the Park.

117.   Plaintiffs conduct their religious services as members of the Lipan-Apache Native American Church, a religious organization established to support and serve the propagation of sincerely held religious beliefs.

118.    Absent injunctive and declaratory relief against the City with respect to Plaintiffs' rights under Article I, Section 6-a of the Texas Constitution, Plaintiffs have and will continue to be imminently and irreparably harmed.

## Count V

### Violation of the Texas Religious Freedom and Restoration Act ("TRFRA")

119.    Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

120.    Plaintiffs have sincere religious beliefs and practices that originate and are related to the land where the Park now sits. Plaintiffs' performance and compliance with these beliefs is a religious exercise.

121.    Through the Bond Project, the City is obliterating Plaintiffs' ability to practice their religion. By refusing Plaintiffs access to the Park, the City makes it impossible for them to practice core aspects of their religion. And by destroying trees and driving away birds from the Park, the City degrades and risks permanently destroying a sacred place for Plaintiffs, which would make core aspects of their religious practice impossible to perform. This places a substantial burden on Plaintiffs' exercise of their religion.

122.    Plaintiffs have suffered harm and mental anguish because the City has denied Plaintiffs access to the Park, which they need to practice their religion, and also because the City has begun to execute plans to permanently destroy a place that Plaintiffs hold sacred.

123.    The City's current and proposed conduct causes Plaintiffs to suffer a special disability on the basis of their minority religion status and especially burdens their religious exercise in the Park.

124.    The City has no compelling interest for designing or implementing the Bond Project as it is currently iterated, for preventing Plaintiffs from accessing the Park, or for failing to accommodate Plaintiffs' religious exercise. When pressed, the City has asserted interests in

aesthetics, historic preservation, and a vague conception of public safety focused on crumbling riverbank walls and falling trees.

125.    The Bond Project is not narrowly tailored to achieve any compelling interest that the City may have for implementing it. Furthermore, the City refused to consider or implement alternatives that would accomplish the City's stated interest in the Bond Project while also preserving Plaintiffs' religious liberty rights.

126.    At least 60 days prior to filing this suit, on May 23, 2023, Plaintiffs gave notice to the City of its religious liberty claims against the City by certified mail, return receipt requested, pursuant to Tex. Civ. Prac. & Rem. Code § 110.006.

127.    Absent injunctive and declaratory relief against the City with respect to Plaintiffs' rights under TRFRA, Plaintiffs have and will continue to be imminently and irreparably harmed.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that judgment be entered in their favor and against Defendants as follows:

- A declaratory judgment that the City's actions violate Plaintiffs' rights under the First Amendment to the United States Constitution;

- A declaratory judgment that the City's actions violate Plaintiffs' rights under RLUIPA;

- A declaratory judgment that the City's actions violate Plaintiffs' rights under Article 6 of the Texas Constitution;

- A declaratory judgment that the City's actions violate Plaintiffs' rights under Article 6-a of the Texas Constitution;

- A declaratory judgment that the City's actions violate Plaintiffs' rights under TRFRA;

- A preliminary and permanent injunction enjoining the City from implementing the Bond Project or otherwise removing trees from the Park until Plaintiffs and the City agree on a specific plan that preserves the Park's spiritual ecology;

- A preliminary and permanent injunction enjoining the City from implementing the Bond Project or otherwise engaging in "bird deterrence" within the Park in a way that violates Plaintiffs' religious rights;

- A preliminary and permanent injunction prohibiting the City from preventing Plaintiffs from accessing and performing religious ceremonies in the Park;

- An award of costs, attorneys' fees, and expenses pursuant to any applicable statute or authority, including 42 U.S.C. § 1988;

- Statutory damages as authorized by any applicable statute or authority, including the Texas Religious Freedom Restoration Act;

- Any such other and further relief as the Court deems just and proper; and

- Retention of jurisdiction by this Court after judgment for the purposes of issuing further appropriate injunctive relief if the Court's declaratory judgment is violated.

Dated: August 9, 2023                    Respectfully submitted,


                                         /s/ *Jonathan D. Guynn*
                                         _____

                                         Mark W. Rasmussen
                                         Texas State Bar No. 24086291
                                         (admission pending)
                                         Jonathan D. Guynn
                                         Texas State Bar No. 24120232
                                         Chance McCraw
                                         Texas State Bar No. 24125807
                                         (admission pending)
                                         JONES DAY
                                         2727 North Harwood Street
                                         Dallas, TX  75201.1515
                                         Telephone:  +1.214.220.3939
                                         E-mail: mrasmussen@jonesday.com
                                         E-mail: jguynn@jonesday.com
                                         E-mail: cmccraw@jonesday.com

                                         John Greil
                                         Texas State Bar No. 24110856
                                         (admission application forthcoming)
                                         Steven T. Collis
                                         Texas State Bar No. 24122632
                                         (admission application forthcoming)
                                         Law & Religion Clinic
                                         University of Texas School of Law
                                         727 East Dean Keeton St.
                                         Austin, TX  78705
                                         Telephone:  +1.512.471.5151
                                         E-mail: john.greil@law.utexas.edu
                                         E-mail: steve.collis@law.utexas.edu

                                         ATTORNEYS FOR PLAINTIFFS