**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

Gary Perez and Matilde Torres,

                *Plaintiffs*,

      v.

City of San Antonio,

                *Defendant*.

Case No.23-cv-00977-FB

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION**
**FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................ 1

FACTUAL BACKGROUND ............................................................................... 3

    I.      The Sacred Area's Religious Significance to Plaintiffs ............................ 3

    II.     The City's Bond Project ............................................................................ 4

    III.    The City Refused to Consider Alternative Proposals ............................. 5

    IV.    The City Refused to Allow Plaintiffs to Worship in the Sacred Area .................. 6

LEGAL STANDARD ......................................................................................... 6

ARGUMENT ...................................................................................................... 7

    I.      Plaintiffs Are Substantially Likely to Succeed On the Merits ............................ 7

          A.     The City's Actions Violate the First Amendment ................................... 7

              1.     The Bond Project Substantially Burdens Plaintiffs' Religious Practice ..................................................................... 8

              2.     The Bond Project Is Not Neutral or Generally Applicable ........... 9

              3.     The Bond Project Is Not Narrowly Tailored to Serve a Compelling Interest ..................................................................... 11

          B.     The City's Actions Violate RLUIPA ..................................................... 14

          C.     The City's Actions Violate Article I, Section 6 of the Texas Constitution ........................................................................................... 15

          D.     The City's Actions Violate Article I, Section 6-a of the Texas Constitution ........................................................................................... 15

          E.     The City's Actions Violate the Texas Religious Freedom and Restoration Act ..................................................................................... 17

    II.     There Is a Substantial Threat of Irreparable Harm to Plaintiffs ........................ 17

    III.    The Ongoing and Threatened Injury to Plaintiffs if the Injunction Is Denied Outweighs Any Harm the City Will Suffer if the Injunction Is Granted ..................................................................................................... 18

    IV.    Granting the Injunction Will Serve the Public Interest ....................................... 18

PLAINTIFFS REQUEST A TEMPORARY  RESTRAINING ORDER PENDING RESOLUTION OF THIS MOTION ................................................................ 19

CONCLUSION ................................................................................................ 20

# TABLE OF AUTHORITIES

Page

CASES

*Adkins v. Kaspar*,
393 F.3d 559 (5th Cir. 2004) ................................................................8

*Ali v. Stephens*,
822 F.3d 776 (5th Cir. 2016) ..............................................................14

*Butnaru v. Ford Motor Co.*,
84 S.W.3d 198 (Tex. 2002)..................................................................19

*Byrum v. Landreth*,
566 F.3d 442 (5th Cir. 2009) ................................................................7

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*,
508 U.S. 520 (1993)...........................................................................7, 9

*De Leon v. Perry*,
975 F. Supp. 2d 632 (W.D. Tex. 2014), *aff'd sub nom. De Leon v. Abbott*, 791
F.3d 619 (5th Cir. 2015) ....................................................................17

*Espinoza v. Mont. Dep't of Revenue*,
140 S. Ct. 2246 (2020).........................................................................7

*Ex parte Herrera*,
2014 WL 4207153 (Tex. App. Aug. 26, 2014)...................................15

*Fraternal Order of Police, Newark Lodge No. 12 v. City of Newark*,
170 F.3d 359 (3d Cir. 1999)...............................................................11

*Fulton v. City of Philadelphia*,
141 S. Ct. 1868 (2021)................................................................. passim

*Giovani Carandola, Ltd. v. Bason*,
303 F.3d 507 (4th Cir. 2002) ..............................................................18

*Granny Goose Foods, Inc. v. Bhd. of Teamsters*,
415 U.S. 423 (1974)............................................................................20

*Holt v. Hobbs*,
    574 U.S. 352 (2015)..................................................................................12

*Kennedy v. Bremerton Sch. Dist.*,
    142 S. Ct. 2407 (2022)..............................................................................11

*Merced v. Kasson*,
    577 F.3d 578 (5th Cir. 2009) .................................................................8, 17

*Mi Familia Vota v. Abbott*,
    497 F.Supp.3d 195 (W.D. Tex. 2020)......................................................17

*Ingebretsen on behalf of Ingebretsen v. Jackson Public Sch. Dist.*,
    88 F.3d 274 (5th Cir. 1996) .....................................................................19

*Opulent Life Church v. City of Holly Springs*,
    697 F.3d 279 (5th Cir. 2012) ...................................................................18

*PCI Transp., Inc. v. Fort Worth & W. R.R. Co.*,
    418 F.3d 535 (5th Cir. 2005) ...................................................................19

*Ramirez v. Collier*,
    142 S. Ct. 1264 (2022)........................................................................12, 14

*Roman Catholic Diocese of Brooklyn v. Cuomo*,
    141 S. Ct. 63 (2020)..................................................................................11

*Scis., L.L.C. v. Vascular Health Scis., L.L.C.*,
    710 F.3d 579 (5th Cir. 2013) ...................................................................17

*Stringer v. Cendant Mortg. Corp.*,
    23 S.W.3d 353 (Tex. 2000)......................................................................17

*Tandon v. Newsom*,
    141 S. Ct. 1294 (2021)..............................................................................11

*Wisconsin v. Yoder*,
    460 U.S. 205 (1972)................................................................................8, 9

**STATUTES**

42 U.S.C.
    § 2000cc(a)(1) .........................................................................................14
    § 2000cc(a)(2) .........................................................................................14

**OTHER AUTHORITIES**

First Amendment ..................................................................................................7, 18

Fourteenth Amendment .............................................................................................7

Douglas Laycock & Steven T. Collis, *Generally Applicable Law and the Free
    Exercise of Religion*, 95 NEB. L. REV. 1, 23–24 (2016) ........................................11

Texas Const. Article 1, § 6-a ............................................................................. passim

Texas Const. Article 1, § 6..................................................................................7, 15

U.S. CONST. Amendment I.........................................................................................7

## INTRODUCTION

Plaintiffs Gary Perez and Matilde Torres are members of the Lipan-Apache Native American Church and believe that a portion of the land in Brackenridge Park (the "Park"), a public park managed by the City of San Antonio (the "City"), is a sacred site where life began in this region. Plaintiffs have used the land within the Park for religious ceremonies for many years and their ancestors used it for millennia before that. The City is preventing Plaintiffs from accessing sacred areas within the Park and is harming the sacred ecology within the Park that is critical to Plaintiffs' religious practices. Plaintiffs filed a complaint to stop the City from these practices. Plaintiffs now seek emergency relief through this motion (the "Motion") to gain access to sacred areas in the park for a religious ceremony on August 12, 2023 (and other ceremonies at other times) and to stop the City from moving forward "with all deliberative speed" with plans to destroy and remove sacred trees and disrupt the nesting of birds that are critical to Plaintiffs' religion.

Plaintiffs believe that a particular riverbend within the Park (the "Sacred Area"), known as Lambert Beach, is cosmologically linked to the constellation Eridanus and that it provides a unique connection point with the spiritual world where routine worship and special religious ceremonies must be performed. This location's sanctity and capacity to function as a sacred space for Plaintiffs is also premised on a delicate "spiritual ecology" related to the natural environment within the Park, including the trees and especially double-crested cormorants that live there. The Park, and in particular the Sacred Area, is among the holiest places on earth to Plaintiffs. Protecting and having access to the Sacred Area is paramount for Plaintiffs' ability to practice their religion.

Archaeological evidence demonstrates that the riverbend in the Park was sacred to Plaintiffs' ancestors thousands of years before it was a park or the City even existed. This is not a case of some random group of citizens wanting to use a park because it is pretty. The Park and the

Sacred Area sit on holy land that has been in use since before the Spanish missions, Republic of Texas, or Brackenridge Park existed. This site is irreplaceable.

On May 6, 2017, San Antonio voters approved funds to rehabilitate the Park, which had fallen into disrepair. The City then developed the Brackenridge Park 2017 Bond Project (the "Bond Project") and only recently approved phase one of the Bond Project over Plaintiffs' objections. The Bond Project calls for the removal of 98 trees and directs City employees to engage in "bird deterrence," which consists of harassing and driving migratory birds from the Park. As part of the Bond Project, the City has also barred Plaintiffs from accessing the Sacred Area by erecting chain link fencing around the area. Most recently, Plaintiffs requested permission to access the Sacred Area to perform a "water offering" ceremony on August 12, 2023. The City refused, offering no accommodations to access the location that were not already available to Plaintiffs as members of the general public. That refusal followed a consistent approach of the City, offering the Plaintiffs nothing, and hoping they will just go away and be satisfied.

The City's ongoing and proposed actions prevent Plaintiffs from practicing their religion. And by destroying trees and driving away birds from the Park, the City degrades and risks permanently destroying the sacred nature of this holy place for Plaintiffs, which destruction would make it impossible to perform fundamental tenets of their religion. Under the federal and Texas constitutional and statutory schemes, such infringements on Plaintiffs' religious liberty rights can be tolerated in only the rarest of situations. To proceed with the Bond Project, the City must demonstrate that the Bond Project is narrowly tailored to achieve a compelling interest. The City cannot meet either prong of this standard. And under the November 2021 amendment to the Texas Constitution, the City has acted unlawfully by enforcing an "order, proclamation, decision, or rule that prohibits or limits religious services." Texas Const. art. 1, § 6-a.

The Court should grant the Motion because Plaintiffs are substantially likely to succeed on the merits of their constitutional and statutory claims, they are suffering irreparable harm due to the violation of their religious liberty rights, the balance of hardships favors Plaintiffs, and entering an injunction for Plaintiffs is in the public interest. While the Court is considering Plaintiffs' request for a preliminary injunction, the Court should enter a temporary order restraining the City from (1) preventing Plaintiffs from holding a religious ceremony at the Sacred Area on August 12, 2023 and from accessing the Sacred Area at other times for religious services; (2) engaging in activities to deter the double-crested cormorant bird from nesting within the Park; and (3) removing trees and other habitat from the Park. Without a temporary injunction, the City will unlawfully infringe Plaintiffs' ability to practice their faith.

The prevailing standard the Supreme Court has provided in cases like this is: "[S]o long as the government can achieve its interests in a manner that does not burden religion, it must do so." *Fulton*, 141 S. Ct. 1868, 1881 (2021) (quotation omitted). Here, the City has not even tried. And a millennia-old sacred site is at risk because of it.

## FACTUAL BACKGROUND

### I.   The Sacred Area's Religious Significance to Plaintiffs

According to Plaintiffs' beliefs, the creation of life near San Antonio began at the Blue Hole spring, which sits just north of the Park. A spirit in the form of a blue panther lived in Blue Hole spring. Another spirit in the form of a double-crested cormorant flew into the Blue Hole spring and was chased away by the blue panther. As the cormorant fled from the spring, its tail feathers scattered life-giving water across the San Antonio River Valley, including the lands that comprise the Park, giving rise to life in this region. Declaration of Gary Perez ("Perez Decl.") ¶ 5.

The shape of the river bend in the Park mirrors and Plaintiffs believe is spiritually connected to the constellation Eridanus, which is often depicted as a celestial river flowing from

3

the waters of Aquarius. According to Plaintiffs' beliefs, this connection between the riverbend and constellation enables a bridge to open between the physical and spiritual worlds. *Id*. ¶ 8.

The Park is also sacred to Plaintiffs due to its "spiritual ecology." *Id*. ¶ 7. For Plaintiffs, three points of reference establish a sacred space: underworld, middle world, and upper world. The underworld exists in water, night, and darkness. The middle world surrounds us on earth. The upper world exists in the sky and stars. The presence and connection of these three worlds establishes a "spiritual ecology" that enables Plaintiffs to commune with the spiritual world. The sanctity of the Park and the Sacred Area is dictated by this spiritual ecology and the connection points between the three worlds, such as the river, trees, and birds that are present there. *Id*. ¶ 6. Harming any one of the connection points disturbs the sanctity of the Park and Sacred Area and their capacities to function as sacred spaces for Plaintiffs. Completely removing one from the Park or Sacred Area would create a spiritual crisis for adherents. *Id*. ¶ 7.

For Plaintiffs and other members of the Native American Church, the Sacred Area is where special religious ceremonies must be performed. *Id*. ¶ 8. Much like a church, the Park and the Sacred Area are critical sites for Plaintiffs' routine worship. Plaintiffs require general access to the Park and the Sacred Area for ceremonies, prayer, fellowship, and religious education, which are all critical to and compelled by their religious belief. *Id*. ¶ 9.

## II.     **The City's Bond Project**

On May 6, 2017, San Antonio voters approved a bond package that included funds to rehabilitate the Park. *Id*. ¶ 11. Six years and multiple iterations later, the Bond Project has still not been implemented at Brackenridge Park, largely due to intense public opposition to the City's proposed plans to destroy heritage trees in the Park. *Id*. ¶ 16. As the City's plans for the Bond Project began to coalesce, the City began driving migratory birds from the Park by removing them, placing obstructions in trees to prevent nesting, shooting "blanks" from firearms, placing a car

alarm in their nesting area, and otherwise making the Park uninhabitable for them. *Id.* ¶ 14. From approximately February 3, 2023, to the present, the City has prevented Plaintiffs from accessing the Sacred Area to perform religious ceremonies or connect with its spiritual ecology by erecting chain link fencing around the site. *Id.* ¶ 18.

During its consideration of potential means to rehabilitate the Park, the City was presented with at least three engineering solutions: two that preserve the majority of tree and bird life but that the City rejected, and a third—which the City ultimately chose—that requires extensive excavation necessitating significant loss of tree and bird life. *See* Declaration of Jonathan Guynn ("Guynn Decl.") ¶¶ 3, 16, Exs. A-1 at 13–25, G at 1–2. On August 3, 2023, the City voted to approve a contract with additional funding for a contractor to begin work on the project at the Park, including the Sacred Area, beginning in the "summer of 2023." Perez Decl. ¶ 15; Guynn Decl. ¶ 15, Ex. F at 6.

### III.   The City Refused to Consider Alternative Proposals

Plaintiffs have informed the City that the Bond Project infringes their religious beliefs on multiple occasions. Plaintiff Gary Perez gave a presentation to the City's Department of Parks and Recreation on July 29, 2022. Brackenridge Park Conservancy invited him to give a presentation about the Bond Project on January 10, 2023. Plaintiffs testified at the March 3, 2023 Texas Historical Commission meeting, the April 19, 2023 Historic Design and Review Commission hearing, and the August 3, 2023 City Council hearing. Perez Decl. ¶ 34. Plaintiffs' counsel submitted written and oral testimony at the April 19 hearing, and provided a detailed letter on May 23, 2023, explaining the factual and legal issues. *Id.* ¶ 15.

When presented with such facts, the City said it did not know about the significance of the Park or Sacred Area to Plaintiffs and other indigenous groups. The City also acknowledged that it

failed to consider Plaintiffs' religious liberty interests during its consideration and design of the Bond Project. But the City nevertheless refused to stop or amend the Bond Project.

IV.   **The City Refused to Allow Plaintiffs to Worship in the Sacred Area**

On July 26, 2023, Plaintiffs requested access to the Sacred Area, which is currently blocked by fencing, to perform a religious ceremony on August 12, 2023. *Id*. ¶ 22. The purpose of the ceremony is to atone for the harm being done to the cormorants in the Park. Approximately 15-20 members of the Native American Church seek to perform this ceremony for approximately 30 minutes starting at 5:30 am on August 12. *Id*. ¶ 21.

The City initially responded to this request on August 3, 2023, stating that it could accommodate it. But the City's accommodation did not permit Plaintiffs to access the Sacred Area where Plaintiffs believe the religious ceremony needs to occur. Instead, the City offered access to a different part (the wrong part) of the Park that was already open to the public.

After clarifying the reason why Plaintiffs needed to access the Sacred Area, the City considered the request further, but late in the day on August 9, 2023, the City told Plaintiffs that it was denying them access to perform the ceremony on August 12, *id*. ¶ 23, and also that it was proceeding "with all deliberate speed" with renovation plans that will destroy the spiritual ecology of the Park and the Sacred Area, *id*. ¶ 31, Guynn Decl. ¶ 12, Ex. D.

On August 9, 2023, Plaintiffs filed their Complaint to stop the City's wrongful conduct and now file this Motion to seek emergency relief to protect their religious liberties.

**LEGAL STANDARD**

A party seeking a preliminary injunction must establish four elements: "(1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will

result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest." *Byrum v. Landreth*, 566 F.3d 442, 445 (5th Cir. 2009).

## ARGUMENT

### I.   Plaintiffs Are Substantially Likely to Succeed On the Merits

Plaintiffs allege that the Bond Project: (1) violates the Free Exercise Clause of the First Amendment (Compl. Count I, ¶¶ 85–92); (2) violates the federal Religious Land Use and Institutionalized Persons Act (Compl. Count II, ¶¶ 93–102); (3) violates Article I, Section 6 of the Texas Constitution (Compl. Count III, ¶¶ 103–09); (4) violates Article I, Section 6-a of the Texas Constitution (Compl. Count IV, ¶¶ 110–16); and (5) violates the Texas Religious Freedom Restoration Act (Compl. Count V, ¶¶ 117–25). For the reasons below, Plaintiffs are substantially likely to succeed on the merits of their claims.

#### A.   The City's Actions Violate the First Amendment

The First Amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend. I. The Free Exercise Clause "applies to the States under the Fourteenth Amendment" and "protects religious observers against unequal treatment and against laws that impose special disabilities on the basis of religious status." *Espinoza v. Mont. Dep't of Revenue*, 140 S. Ct. 2246, 2254 (2020) (citation omitted). The Free Exercise Clause requires strict scrutiny of laws that disfavor religion, lack neutrality, or are not generally applicable. *See Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 532 (1993).

"[R]eligious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection." *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1876, (2021) (quoting *Thomas v. Rev. Bd. of Ind. Employment Sec. Div.*, 450 U.S. 707, 714 (1981)).

The Court's task is to decide whether the burden the City has placed on Plaintiffs' religious exercise is constitutionally permissible.

        1.    <u>The Bond Project Substantially Burdens Plaintiffs' Religious Practice</u>

Plaintiffs have sincere religious beliefs regarding the sanctity of the lands within the Park and the spiritual ecology of the Park. These beliefs derive from their faith in spiritual matters.

It is equally clear that the City's actions substantially burden Plaintiffs' religious practice. "[A] government action or regulation creates a 'substantial burden' on a religious exercise if it truly pressures the adherent to significantly modify his religious behavior and significantly violates his religious beliefs." *Adkins v. Kaspar*, 393 F.3d 559, 570 (5th Cir. 2004). Here, the City has barred Plaintiffs from entering the area within the Park that is most sacred to them and where their religion compels them to worship and perform ceremonies. Perez Decl. ¶ 18. For Plaintiffs to engage in the worship mandated by their faith (including the ceremony on August 12), they are faced with the choice of violating their religious beliefs by worshipping in the wrong place, or violating City ordinances by breaching the City's barriers. Like the Amish parents in *Wisconsin v. Yoder*, 460 U.S. 205 (1972), Plaintiffs would face criminal penalties if they engaged in conduct essential to their religion. Government actions such as these which make a claimant's religious exercise impossible or illegal meet the substantial burden test. *See, e.g.*, *Merced v. Kasson*, 577 F.3d 578, 591 (5th Cir. 2009) ("Merced cannot perform the ceremonies dictated by his religion. This is a burden, and it is substantial.").

Further, the Bond Project threatens to substantially and permanently burden Plaintiffs' religious beliefs through the destruction of the Park's and Sacred Area's spiritual ecology. Pursuant to the Bond Project, City workers will remove 98 trees from the Park, and the repairs and updates the City will make to retaining walls along the riverbank will prevent the growth of new trees by the river. Perez Decl. ¶ 17. And the City will continue to drive birds out of the area to

prevent nesting and enable it to remove the 98 trees. The loss of the trees and birds, through the Bond Project, will destroy the holiness of the Sacred Area to Plaintiffs. *Id.* ¶ 7. Destruction of a unique, sacred space necessary to practice one's religion easily meets the substantial burden test, as does government making it impossible for religious peoples to engage in worship.

2.    <u>The Bond Project Is Not Neutral or Generally Applicable</u>

The Bond Project is not neutral as applied to Plaintiffs' religious practice. "Government fails to act neutrally when it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature." *Fulton*, 141 S. Ct. at 1877. Importantly, "[a] regulation neutral on its face may, in its application, nonetheless offend the constitutional requirement for governmental neutrality if it unduly burdens the free exercise of religion." *Yoder*, 406 U.S. at 220; *see also Lukumi*, 508 U.S. at 562. (Souter, J., concurring) (explaining that a law must be formally *and* substantively neutral by safeguarding "a right to engage in religious activity free from unnecessary governmental interference."). Such is the case here.

The City's *design* and *implementation* of the Bond Project epitomize intolerance towards Plaintiffs' religious beliefs and practices. The City never even considered Plaintiffs' religious liberty interests when it decided how to implement the Bond Project. Even after learning about the Park's and the Sacred Area's critical importance to Plaintiffs' faith, the City has persisted in blockading sacred sites, harassing cormorants, and moving forward with plans to begin removing massive numbers of trees from the Park. Perez Decl. ¶ 15; *see* Guynn Decl. ¶¶ 2–7, Exs. A-1–A-5. The City's actions demonstrate its outright indifference towards Plaintiffs' religious interests.

The *effects* of the Bond Project also violate the neutrality principle. Plaintiffs must request permission from the City if they wish to enter their religious sanctuary, which the City has refused to grant with respect to the ceremony on August 12. The fencing around the sacred site is like a fence around a cathedral, mosque, or synagogue—all of which are unimaginable in our

9

constitutional order. Further, the Bond Project threatens to destroy the Sacred Area while placing no burden on any other religion's sacred site. Setting aside the obvious inequities that the Bond Project creates among religious adherents, the City's actions will inflict harm of such profound and lasting magnitude to Plaintiffs' religious practice that the Bond Project cannot be called "neutral" towards Plaintiffs' holy site or religious practice under any coherent meaning of that term.

The Bond Project is not generally applicable as applied to Plaintiffs' religious practice. A law is not generally applicable if it "invite[s]" the government to consider the particular reasons for a person's conduct by providing "a mechanism for individualized exemptions" or if it "prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Fulton*, 141 S. Ct. at 1877. Here, the City has undermined any notion that the Bond Project is "generally applicable" by restricting access to the Sacred Area while permitting liberal access to secular areas within the Park.

The City plans to remove trees, repair retaining walls along the riverbank, and make other changes throughout the Park. *See* Perez Decl. ¶ 17. But it has blocked only three areas of the Park from public use. Guynn Decl. ¶ 10, Ex. C-1 at 1. The largest area blocked from public use covers the entirety of the Sacred Area and extends no further. *Id*. Not even a stone's throw away in every direction, the City permits Park visitors to visit pavilions, rest under shade trees (including trees targeted for removal), and enjoy unfettered access to the riverbanks (including with retaining walls scheduled for repair). *Id*. The City's bird deterrence efforts have also been most acute within this fenced area, even though cormorants, egrets, and other migratory birds roost throughout the Park. *See* Perez Decl. ¶ 26, Ex. D. For its own reasons, the City has deployed plans that prohibit and especially disadvantage Plaintiffs' religious conduct while permitting secular conduct in the Park. Such plans and conduct are anything but "generally applicable."

Whatever the City's claimed interests (a moving target), the City is not applying them to recreational activities or any other activity in the Park other than Plaintiffs' worship. This represents an impermissible value judgment. As in other cases where government has violated the Free Exercise Clause, the City has made "a value judgment that secular [recreational] motivations" are more important and worthy of protection than Native religious motivations. *Fraternal Order of Police, Newark Lodge No. 12 v. City of Newark*, 170 F.3d 359 (3d Cir. 1999). This always triggers strict scrutiny. *Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021); *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67–68 (2020). *See also* Douglas Laycock & Steven T. Collis, *Generally Applicable Law and the Free Exercise of Religion*, 95 NEB. L. REV. 1, 23–24 (2016).

> 3.    The Bond Project Is Not Narrowly Tailored to Serve a Compelling Interest

Once a plaintiff establishes an infringement of rights under the Free Exercise Clause, "the focus then shifts to the defendant to show that its actions were nonetheless justified and tailored consistent with the demands of [Supreme Court] case law." *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2421, (2022). A government policy that is not neutral or not generally applicable survives "only if it advances interests of the highest order and is narrowly tailored to achieve those interests," meaning that "so long as the government can achieve its interests in a manner that does not burden religion, it must do so." *Fulton*, 141 S. Ct. at 1881 (quotation omitted).

When considering the governmental interests at issue, a court must not rely on "broadly formulated interests." Instead, it "must scrutinize the asserted harm of granting specific exemptions to particular religious claimants." *Id*. (quotation omitted). The relevant question, therefore, is not whether the City has a compelling interest in advancing public interests related to the Bond Project, but whether the City has a compelling interest in denying a religious exemption to Plaintiffs. *See id*. Under that rubric, the City cannot prove that its chosen means for the Bond Project are narrowly tailored to achieve a compelling governmental interest as to Plaintiffs.

First, the City has no compelling interest that prevents it from preserving Plaintiffs' holy site or accommodating their requests to worship in the Sacred Area. The City has said that the Bond Project is justified by the public's interests in promoting "public safety." *See* Guynn Decl. ¶ 9, Ex. C. But the fences around the Sacred Area were not erected for public safety reasons; they were put up in February 2023—long after the purported public safety risks were known—to facilitate heightened "bird deterrence" measures, such as deploying mylar balloons in the Sacred Area's trees and detonating pyrotechnics. Perez Decl. ¶ 14; *see* Guynn Decl. ¶ 14, Ex. E.

When asked to elaborate on its public safety concerns, the City said that Park visitors could not be admitted into the fenced areas around the Sacred Area because the retaining walls were "collapsing" and that "stones" and "trees abutting the walls, are in danger of falling on pedestrians." Guynn Decl. ¶ 9, Ex. C. The City's explanation fails. Rank speculation, such as a pedestrian being struck by a falling tree or falling stone from a retaining wall, is insufficient to satisfy strict scrutiny, *see Fulton*, 141 S. Ct. at 1882 (citation omitted), because it "fails to engage in the sort of case-by-case analysis" required. *Ramirez v. Collier*, 142 S. Ct. 1264, 1280 (2022). The City's explanation is also factually wrong. Plaintiff Gary Perez recently visited the area and took photographs of the retaining walls and trees. *See* Perez Decl. ¶ 25, Exs. C–F. They show no signs of the safety risks that the City now claims. *See id*. ¶ 27, Exs. A–B.

The City's explanation also fails because "collapsing" retaining walls, "trees abutting the walls," and even diseased and sick trees exist in many places throughout the Park but the City leaves these other places open to the public and even encouraged Plaintiffs to use them. Guynn Decl. ¶ 9, Ex. C (referring to "three alternatives" within the unfenced areas of the Park where the City proposed for Plaintiffs to perform their August 12, 2023 ceremony). Such under-inclusiveness undermines the City's purported interest in public safety. *See Holt v. Hobbs*, 574 U.S. 352, 364–

65 (2015) (holding proof that a government's proffered objectives are not pursued with respect to analogous nonreligious conduct undermines the purported compelling interest). The City's public safety concerns ring hollow given the many years that it knowingly allowed these purported safety risks to go unaddressed, and also because it currently tolerates the public to endure these purported risks in all other areas of the Park outside the Sacred Area.

To demonstrate that the Bond Project is narrowly tailored to achieve the City's compelling interest, the City must show that it is using the least restrictive means to further public safety. The City cannot make that showing as to its plans to remove trees and birds from the Park because there are less restrictive alternatives that would accommodate Plaintiffs' free exercise rights that the City rejected due to cost considerations.

At least two engineers have suggested alternative designs to repair the retaining walls. One even offered to pay the difference in price if the alternative design was more expensive. These alternative proposals would allow trees to grow several feet closer to the riverbank. Yet the City rejected these alternatives in favor of a proposal that will require the removal of far more trees and prevent future trees from growing close to the riverbank. Guynn Decl. ¶¶ 3, 16, Exs. A-1 at 13–25, G at 1–2. Further, as evidenced by the ever-changing Bond Project, more trees can be preserved than under the current plan. Additionally, the City has implemented a blunderbuss "bird deterrence" approach that affects all species of bird in the Park to drive them from the rookery. Perez Decl. ¶ 14. The City could target the particular species of bird it considers a nuisance but instead has harassed all birds.

The same holds true for the City's blanket refusal to permit Plaintiffs to enter anywhere along the riverbend for worship services. Plaintiffs have requested permission to conduct a brief 15–30 minute ceremony, with only 15-20 people, under the supervision of City personnel, at a

place within the Sacred Area that the City allows. Id. ¶ 21. Under such conditions, the City cannot maintain that Plaintiffs and members of their church will be in grave danger.

The City has sealed off the entire Sacred Area under the rationale of protecting the "health, safety, and welfare" of public, meaning that it is preventing Plaintiffs from exercising their own judgment regarding the priority they place on religious observance. But not all of the walls and trees in this area are unsafe. See id. ¶ 25, Exs. C–F. The City could easily permit a small group of participants into the Sacred Area without placing anyone's safety at risk.

And in any event, it "gets things backward" to require Plaintiffs to "'identify any less restrictive means." *Ramirez*, 142 S.Ct. at 1281. The City must show there is no possible way to safely hold the ceremony. Moreover, the City fails the least restrictive means analysis if this court can *sua sponte* propose a better alternative. *See id*. (the court *sua sponte* offered alternatives, including requiring that government employees undergo training).

**B.     The City's Actions Violate RLUIPA[1]**

The Religious Land Use and Institutionalized Persons Act ("RLUIPA") prohibits the government from "impos[ing] a substantial burden on the religious exercise of a person" or group, "unless the government demonstrates that imposition of the burden" is (1) in furtherance of a compelling government interest and (2) is tailored in the least restrictive means possible. 42 U.S.C. § 2000cc(a)(1). "Courts must construe RLUIPA 'in favor of a broad protection of religious exercise, to the maximum extent permitted by the terms of this chapter and the Constitution.'" *Ali*

---

[1] RLUIPA applies where the substantial burden affects an activity that receives federal funding or commerce with foreign nations or Native Americans. *See* 42 U.S.C. § 2000cc(a)(2). Travel to the Park and commercial activity within the Park affect commerce with Native Americans. It is also undisputed that the City has coordinated with the United States Department of Agriculture and United States Fish and Wildlife Services to carry out "bird deterrence" in the Park. The Park is also listed on the United States government's National Register of Historic Places.

*v. Stephens*, 822 F.3d 776, 783 (5th Cir. 2016). This protection is so broad that it may "require the Government to expend additional funds to accommodate citizens' religious beliefs." *Hobby Lobby*, 573 U.S. at 730.

For the reasons discussed in Part I.A.1, the City's actions impose a substantial burden on Plaintiffs' sincere religious beliefs. Under RLUIPA, Plaintiffs' showing of substantial burden on their sincere religious beliefs triggers strict scrutiny. As explained in Part I.A.3, the City cannot show that the Bond Project is narrowly tailored to achieve a compelling interest.

### C.       The City's Actions Violate Article I, Section 6 of the Texas Constitution

In relevant part, Article I, Section 6 of the Texas Constitution provides "All men have a natural and indefeasible right to worship Almighty God according to the dictates of their own consciences. . . . No human authority ought, in any case whatever, to control or interfere with the rights of conscience in matters of religion . . . ." Importantly, "[t]he Texas Constitution provides greater protections for the free exercise of one's religion than does the federal constitution." *Ex parte Herrera*, 2014 WL 4207153, at *4 (Tex. App. Aug. 26, 2014).

For the reasons discussed in Part I.A.1, the City's actions impose a substantial burden on Plaintiffs' sincere religious beliefs. As explained in Part I.A.2, the City's actions are not neutral or generally applicable. As explained in Part I.A.3, the City cannot show that the Bond Project is narrowly tailored to achieve a compelling interest.

### D.       The City's Actions Violate Article I, Section 6-a of the Texas Constitution

In 2021, the people of the state of Texas adopted Article I, Section 6-a of the Texas Constitution, which provides:

> This state or a political subdivision of this state may not enact, adopt, or issue a statute, order, proclamation, decision, or rule that prohibits or limits religious services, including religious services conducted in churches, congregations, and places of worship, in this state by a religious organization established to support and serve the propagation of a sincerely held religious belief.

15

This amendment came largely in response to the closures of places of worship from public safety concerns during the COVID-19 pandemic, but the protections it affords are not limited to a pandemic. HOUSE RESEARCH ORGANIZATION, Constitutional amendments proposed for the November 2021 ballot 9 (2021). Thus, the amendment provides broad protection to any religious service against any act of state or local government, including those intended to promote public safety. In short, the constitutional amendment was passed for situations exactly like this one. Under the amendment, churches—like the Native American Church and not the City—have the right to decide whether attending worship services at the Sacred Area poses a threat to their safety. TEXAS LEGISLATIVE COUNCIL, Analyses of Proposed Constitutional Amendments 14 (2021).

The Bond Project violates Article I, Section 6-a of the Texas Constitution. Plaintiffs are not able to attend religious services, including the ceremony on August 12th, because the City has closed the Sacred Area. See Perez Decl. ¶¶ 23–24. And the planned removal of the trees and continued deterrence of birds will remove key elements of Plaintiffs' religious services, effectively closing the doors to Plaintiffs' place of worship. Section 6-a forbids the City from engaging in these acts under the guise of advancing public safety and allows Plaintiffs to make this determination for themselves. The City's closure of Plaintiffs place of worship therefore runs afoul of Article I, Section 6-a of the Texas Constitution.

Counsel is unaware of any judicial decisions interpreting this provision. However, its plain text is straightforward. The City, "a subdivision of this state," is enforcing a "rule" that is "limit[ing] religious services" at the Sacred Area by the Lipan-Apache Native American Church, "a religious organization established to support and serve the propagation of a sincerely held religious belief." When interpreting the Texas Constitution, courts "rely heavily on its literal text and must give

effect to its plain language." *Stringer v. Cendant Mortg. Corp.*, 23 S.W.3d 353, 355 (Tex. 2000). The plain language of Article I, Section 6-a prohibits the City's actions.

### E.      The City's Actions Violate the Texas Religious Freedom and Restoration Act

The Texas Religious Freedom Restoration Act ("TRFRA") "provides protections to religious freedom 'in addition to the protections provided under federal law' and the Texas and United States constitutions." *Needville*, 611 F.3d at 259. The elements of a TRFRA claim are: "(1) whether the government's regulations burden the plaintiff's free exercise of religion; (2) whether the burden is substantial; (3) whether the regulations further a compelling governmental interest; and (4) whether the regulations are the least restrictive means of furthering that interest." *Merced v. Kasson*, 577 F.3d 578, 588 (5th Cir. 2009).

For the reasons discussed in Part I.A.1, the City's actions impose a substantial burden on Plaintiffs' sincere religious beliefs. Under TRFRA, Plaintiffs' showing of substantial burden on their sincere religious beliefs triggers strict scrutiny. As explained in Part I.A.4, the City cannot show that the Bond Project is narrowly tailored to achieve a compelling interest.

## II.   There Is a Substantial Threat of Irreparable Harm to Plaintiffs

To satisfy the second prong of the preliminary-injunction test, Plaintiffs must show that in the absence of an injunction they are "likely to suffer irreparable harm." *Daniels* Health *Scis., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579, 585 (5th Cir. 2013). Irreparable harm refers to harm for which there is no adequate remedy at law. *Id*. The violation of Plaintiffs' religious liberty rights satisfies this standard as a matter of law. *See De Leon v. Perry*, 975 F. Supp. 2d 632, 663 (W.D. Tex. 2014), *aff'd sub nom. De Leon v. Abbott*, 791 F.3d 619 (5th Cir. 2015) ("Federal courts at all levels have recognized that violation of constitutional rights constitutes irreparable harm as a matter of law."). "Even the violation of fundamental constitutional rights for minimal periods of time 'unquestionably constitutes irreparable injury.'" *Mi Familia Vota v. Abbott*, 497

F.Supp.3d 195, 219 (W.D. Tex. 2020) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). The existence of alternative means of exercising one's fundamental rights "does not eliminate or render harmless the potential continuing constitutional violation of a fundamental right." *Deerfield Med. Ctr.*, 661 F.2d at 338. These principles also apply in the RLUIPA context as well. *Opulent Life Church*, 697 F.3d at 295.

**III.    The Ongoing and Threatened Injury to Plaintiffs if the Injunction Is Denied Outweighs Any Harm the City Will Suffer if the Injunction Is Granted**

The City cannot establish any harm from a preliminary injunction because the City has not done anything to implement the Bond Project for the past six years besides harass birds and fence off sacred portions of the Park. The delay of a few more months to adjudicate this case will not harm the City. More fundamentally, the City suffers no cognizable harm from a preliminary injunction that prevents it from violating Plaintiffs' religious liberty rights. *See Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002). Further, the City has represented it would not do some of the activities it is currently engaged in. As late as February 1, 2023, the City represented that bird harassment "w[ould] continue through mid-June." Guynn Decl. ¶ 14, Ex. E. Mid-June was nearly two months ago, yet the City continues with its harassment of birds in the Park unabated. Because the City recognizes it is not supposed to be doing this activity, it cannot now claim any harm from being enjoined from doing what it is not supposed to be doing.

When balanced against the irreparable injury suffered by Plaintiffs from the Bond Project, any harm to the City from a preliminary injunction is *de minimis*.

**IV.    Granting the Injunction Will Serve the Public Interest**

Granting the injunction in Plaintiffs' favor will serve the public interest. "[I]njunctions protecting First Amendment freedoms are always in the public interest." *Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 298 (5th Cir. 2012) (citation omitted); *see also Ingebretsen*

*on behalf of Ingebretsen v. Jackson Public Sch. Dist.*, 88 F.3d 274, 280 (5th Cir. 1996) (holding that injunctions preventing the violation of constitutional rights are "always in the public interest."). "This principle applies equally to injunctions protecting RLUIPA rights," *id.*, and applies for analogous religious liberty interests arising under the Texas Constitution and TRFRA.[2]

**PLAINTIFFS REQUEST A TEMPORARY**
**RESTRAINING ORDER PENDING RESOLUTION OF THIS MOTION**

While the Court is considering Plaintiffs' request for preliminary injunctive relief, Plaintiffs request that the Court enter a temporary order restraining the City from (1) preventing Plaintiffs from holding a religious ceremony in Brackenridge Park (the "Park") at the Sacred Area on August 12, 2023 and from accessing the Sacred Area at other times for religious services; (2) engaging in activities to deter the double-crested cormorant bird from nesting within the Park; and (3) removing trees and other habitat from the Park.

Similar to a preliminary injunction, a movant for a temporary restraining order must show:

(1) a substantial likelihood that he will prevail on the merits, (2) a substantial threat that he will suffer irreparable injury if the injunction is not granted, (3) that his threatened injury outweighs the threatened harm to the party whom he seeks to enjoin, and (4) that granting the preliminary injunction will not disserve the public interest.

*PCI Transp., Inc. v. Fort Worth & W. R.R. Co.*, 418 F.3d 535, 545 (5th Cir. 2005). Plaintiffs meet all four requirements. As discussed above, Plaintiffs are (1) substantially likely to prevail on the merits, *see supra* § I; (2) Plaintiffs religious liberties are under threat and will suffer irreparable harm without an injunction, *see supra* § II; (3) Plaintiffs' injuries outweigh any delay in the belated

---

[2] Texas law does not weigh the public interest factor. Therefore, this factor is presumptively satisfied for the Texas law claims. *See Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002) ("To obtain a temporary injunction, the applicant must plead and prove three specific elements: (1) a cause of action against the defendant; (2) a probable right to the relief sought; and (3) a probable, imminent, and irreparable injury in the interim.").

and already-much-delayed Bond Project, *see supra* § III; and (4) granting an injunction is in the public's interest. *See supra* Section IV.

Further, a temporary restraining order should be granted because it prevents further irreparable harm to Plaintiffs until the Court considers Plaintiffs' motion for preliminary injunction. *See Granny Goose Foods, Inc. v. Bhd. of Teamsters*, 415 U.S. 423, 439 (1974) (holding a temporary restraining order should preserve the status quo "just so long as is necessary to hold a hearing"). The City approved the final funding for the first phase of the Bond Project on August 3, 2023, Perez Decl. ¶ 15, and has begun working with the USACE and THC on the § 106 permit, *see* Guynn Decl. ¶ 8, Ex. B. The City could move forward with tree removals any day now. Indeed, counsel to the City notified counsel for Plaintiffs that the it is the City's "intention to proceed with repairs [to the Park] with all deliberate speed." Guynn Decl. ¶ 12, Ex. D. Further, the City continues to restrict access to the Sacred Area and harass birds in the Park. Plaintiffs wish to conduct a religious water offering ceremony on August 12, 2023, but the City has denied their request for access to the Park. Perez Decl. ¶¶ 23–24. Plaintiffs suffer further irreparable harm each day that passes and require immediate relief.

Without a temporary restraining order, Plaintiffs' religious liberties will be violated. Theyhave no access to the Sacred Area, the City has promised to begin removing trees within the Park with "all deliberate speed," and the cormorant rookery remains under constant threat and harassment. The burden on Plaintiffs' religious beliefs will be unabated without an emergency order restraining the City's actions.

## CONCLUSION

Plaintiffs respectfully request that the Court adjudicate this motion on an expedited basis and issue a temporary restraining order to restore access to the Park, protect the trees, and cease the harassment of birds while the Court further considers the merits of this Motion.

Dated: August 10, 2023                    Respectfully submitted,


  /s/ *Jonathan D. Guynn*
_____

Mark W. Rasmussen
Texas State Bar No. 24086291
Jonathan D. Guynn
Texas State Bar No. 24120232
Chance McCraw
Texas State Bar No. 24125807
JONES DAY
2727 North Harwood Street
Dallas, TX  75201.1515
Telephone:  +1.214.220.3939
E-mail: mrasmussen@jonesday.com
E-mail: jguynn@jonesday.com
E-mail: cmccraw@jonesday.com

John Greil
Texas State Bar No. 24110856
(admission application forthcoming)
Steven T. Collis
Texas State Bar No. 24122632
(admission application forthcoming)
Law & Religion Clinic
University of Texas School of Law
727 East Dean Keeton St.
Austin, TX  78705
Telephone:  +1.512.471.5151
E-mail: john.greil@law.utexas.edu
E-mail: steve.collis@law.utexas.edu

ATTORNEYS FOR PLAINTIFFS