UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| GARY PEREZ AND MATILDE TORRES, § | | |
| Plaintiffs, § | | |
| § | | |
| v. § | | CASE NO. 5:23-cv-00977-FB |
| § | | |
| CITY OF SAN ANTONIO, § | | |
| Defendant, § | | |

**DEFENDANT CITY OF SAN ANTONIO'S RESPONSE IN OPPOSITION TO PLAINTIFFS' EMERGENCY MOTION FOR INJUNCTION PENDING APPEAL [DKT. 54]**

TO:  FRED BIERY, UNITED STATES DISTRICT JUDGE:

Pursuant to Fed. R. Civ. P. 62(d), Defendant City of San Antonio ("City") files this Response in Opposition to Plaintiffs' Emergency Motion for Injunction Pending Appeal ["Motion," **Dkt. 54**], and would respectfully show as follows:

## I. INTRODUCTION AND RELIEF SOUGHT

1.      Pursuant to Fed. R. Civ. P. 62(d)—and based on about eight pages of argument in their Motion [**Dkt. 54**]—Plaintiffs now seek, on an emergency basis, the same injunctive relief pending appeal that they failed to prove they were entitled to during the Preliminary Injunction Hearing ("PI Hearing").  Plaintiffs seek to further delay the City from proceeding with repairs and improvements to an approximately two-acre area of Brackenridge Park, and to leave the Project in limbo while they pursue a meritless appeal from this Court's rulings.

2.      In relevant part, Fed. R. Civ. P. 62(d) provides:

> **(d) Injunction Pending an Appeal.** While an appeal is pending from an interlocutory order or final judgment that grants, continues, modifies, refuses, dissolves, or refuses to dissolve or modify an injunction, the court

may suspend, modify, restore, or **grant an injunction on terms for bond or other terms that secure the opposing party's rights**.[1]

3. For the reasons set out more fully below, the Court was correct in its decisions on Plaintiffs' Motion for Preliminary Injunction, and Plaintiffs have failed to carry their burden of showing sufficient grounds for granting the extraordinary remedy of an injunction pending appeal. The record amply supports this Court's rulings. Delay means the City and the public remain hostage to an injunction the Plaintiffs sought but could not support with legal authority and evidence. Delay means continued public health and safety risks, the real danger of which cannot be ascertained with certainty. Even Plaintiff Gary Perez admitted in his testimony that "Safety is Paramount."

4. The Plaintiffs are bound by the entire record made at the injunction hearing. The record shows more than ample evidence that the City's current design for the project is the product of a thorough, comprehensive, and complex process involving experts in many disciplines, including arborists, civil engineers, architects, landscape architects, wildlife biologists, and scientists. The record fully supports the Court's conclusions on Issues 2 (trees) and 3 (cormorants). In their Motion, Plaintiffs point to snippets of testimony taken out of context, which mischaracterize the entirety of the evidence, including over 120 exhibits, to which no objection was made.

## II.  FACTUAL BACKGROUND

5. As a preliminary matter, the City offers these observations:

---

[1] Unless otherwise indicated, all emphasis in quoted passages throughout this Response has been supplied and did not appear in the originals, and all internal citations have been omitted.

- There are places in Brackenridge that many people consider special. The specific area in question, the area along the San Antonio River approaching Lambert Beach, is one of those special places.

- This place has historic river walls for flood control and a variety of other good reasons, many of which are essential to public safety. The walls in this place need repair, but there is debate about how to accomplish those repairs.

- The City has temporarily fenced off this area for safety reasons, and in order to implement Phase I of the 2017 Bond election project, which will remedy these safety problems by reinforcing, strengthening, and restoring the historic walls along the river. These improvements are vitally important to promote the safety of visitors to the park, including Plaintiffs. This temporary closure is for public safety, and in the public interest.

- Aside from what they called the "Sacred Area" when they recently requested access, Plaintiffs want the current "viewshed" to be permanently maintained. They want this viewshed of the River in the entire Phase I project area to stay this way permanently, no matter the needs or wants of the public.

- This particular spot of the River also has significant other cultural and recreational features and uses, however, so there must be a balance. The Court found that balance.

- The City thoroughly evaluated and re-evaluated the issues involving the trees. The evidence established that although there are other designs or

3

- engineering solutions that could be used to repair and reconstruct the river walls, no more trees can be preserved by any of these alternative methods.

- The record shows that as recently as this past March, the City carefully evaluated – and re-evaluated - the same alternative engineering solution proffered by Plaintiffs' expert, Dr. Shafique.  As Ms. Shanon Miller testified, "we were asked to really look at the alternatives and to figure out whether or not what was being proposed was the best solution moving forward, that we were saving as many trees as possible.  The consensus in the meeting with the -- with the arborists was that no additional trees would be saved because they would still be impacted by the construction regardless of the methodology."  (See, Unofficial Transcript, pp. 603-04).

- As the Court correctly observed, this is a brief snapshot of time in the historic Brackenridge Park. In time, the new trees will have experienced years of growth to replace those trees that must be removed and/or relocated as part of the Project.

- The City has a governing body that has made decisions, and has delegated authority to Department Directors.  These directors have had the benefit of recommendations and decisions of volunteer members of the Planning Commission, the Historic and Design Review Commission, and the Board of Adjustment.  The City's Design Team is comprised of recognized experts in engineering, tree science, architecture, and planning, among others.  The City must navigate a complex collection of regulatory controls.

4

- Plaintiffs want this court to "second guess" the expert engineers, arborists, architects, wildlife biologists, as well as the State Veterinarian. The Court correctly declined that invitation.

- Migratory birds including cormorants are being temporarily deterred from nesting in the Project Area, so that the project can be completed. However, these migratory birds are allowed to nest throughout the rest of Brackenridge Park (340+ acres), or across Hildebrand, to the Blue Hole and property owned by the Sisters of Charity of the Incarnate Word, and into Olmos Basin.

- And, the migratory birds are still allowed to forage, feed and rest in the Project Area, and will be allowed in the Project Area even during construction. The deterrence measures are aimed at nesting, not merely being present, for reasons plainly and correctly explained by the Court.

- Any questions about bird deterrence after completion of construction involve hypothetical, advisory opinions, beyond the jurisdiction of the Court to resolve at this time.

- The evidence at the PI Hearing clearly established that this section of the park will be open to public access again after construction is complete in about eight months.

### III. PROCEDURAL BACKGROUND

6. On September 25 and 27-29, 2023, the Court conducted an evidentiary hearing on Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction [**Dkt. 5**].

5

7. On October 2, 2023, after considering all the evidence presented by the parties, including all the exhibits that were admitted into evidence without objection, the Court entered its "Partial Order Concerning Preliminary Injunction Issues" ["Partial Order," **Dkt. 47**], finding *inter alia* that "Plaintiffs have a sincere religious belief and are entitled to be present" on two specific dates "at a sacred site in Brackenridge Park," as "depicted in Plaintiffs' Exhibit 58. The Partial Order describes the site as comprising "an approximate 20-foot-by-30-foot rectangular plot out of two acres of land located between two bald cypress trees." *Id*.

8. On October 11, 2023, the Court entered its "Opinion and Order Granting in Part and Denying in Part Plaintiffs' Request for Preliminary Injunction" ["Injunction Order," **Dkt. 52**], identifying the following three items of relief sought by Plaintiffs: **(1)** "Restore access for religious services in the Sacred Area, <u>which is the northernmost point on the south bank of the San Antonio River</u>" ("Item 1") (emphasis added); **(2)** "Preserve the spiritual ecology of the Sacred Area by minimizing tree removal" ("Item 2"); and **(3)** "Preserve the spiritual ecology of the Sacred Area by allowing cormorants to nest" ("Item 3"). **Dkt. 52** at 1.

9. Based on the extensive record, the Court decided Item 1 as follows:

> With reference to Item 1, "access for religious services in the Sacred Area," the Court finds that Plaintiffs have a sincere religious belief and have met their burden to prove the four elements for injunctive relief. The Court adopts as its own Plaintiffs' Proposed Findings of Fact and Conclusions of Law and the legal authorities cited to support granting access for "religious services" involving 15 to 20 people for no more than an hour on specified astronomical dates coinciding with Plaintiffs' spiritual beliefs. Plaintiffs shall provide those dates in advance to the City during the pre-construction and construction periods so that Plaintiffs may be accommodated for entry to the Sacred Area and appropriate security provided. Plaintiffs' request for access in Item 1 is GRANTED [**Dkt. 52** at 2].

10. The City does not intend to appeal the Court's ruling on Item 1.

6

4867-2950-6184, v. 1

11. Turning then to Item 2 and Item 3—concerning what Plaintiffs call the "spiritual ecology" of the "Sacred Area"—the Court correctly observed:

> Clearly the area does not look the same as it did thousands of years ago in the cave painting exhibit. Nor does it look the same as 100 years ago when there really was a beach as depicted in various exhibits. Nor will it look the same 100 years from now [**Dkt. 52** at 3].

12. Regarding Item 3, in particular, the Court found as follows:

> . . . the Court heard credible testimony of thousands of egrets, herons, and cormorants and their excrement nesting in the Project Area during their migrations at different times of the year. Once nested, the Migratory Bird Treaty Act precludes removal. The Court finds the bird deterrent operation is in the realm of public health and safety. To grant Plaintiffs' relief regarding Item 3 would effectively put the Project on hold ad infinitum, given the different species' migration patterns and the Migratory Bird Treaty Act. There could not be an eight month window of opportunity to accomplish the Project [**Dkt. 52** at 4].

13. With reference to Item 2 and Item 3 of Plaintiffs' requested relief, moreover, the Count found that the City "met its burden of proving a compelling government interest for public health and safety, and [that] the equities favor the City on those two items [**Dkt. 52** at 5]." In support of its findings regarding Items 2 and 3, the Court adopted "as its own the City's Proposed Findings of Fact and Conclusions of Law and the legal authorities cited regarding Plaintiffs' requested Item 2 and Item 3," and accordingly denied those requests [**Dkt. 52** at 5].

14. The Phase I work to be done in the Park is intended to be—and will be—temporary, provided the City is able to begin such work without inordinate delays caused by protracted litigation. Fears, doubts, and speculation cannot support a preliminary injunction or a Rule 62(d) injunction pending appeal.

15. Faced with these rulings, Plaintiffs filed their Notice of Appeal on October 16, 2023 [**Dkt. 53**], seeking the Fifth Circuit's review of the Court's: **(a)** October 2, 2023,

"Partial Order Concerning Preliminary Injunction Issues" [**Dkt. 47**]; and **(b)** October 11, 2023, "Opinion and Order Granting in Part and Denying in Part Plaintiffs' Request for Preliminary Injunction" [**Dkt. 52**] (collectively, "Orders").

## IV.   ARGUMENT

### A.  THE LAW GOVERNING FED. R. CIV. P. 62(D) INJUNCTIONS PENDING APPEAL

16.     A federal district court, in deciding whether to grant an injunction pending appeal in a federal case, considers: **(a)** whether it is likely that the party seeking such an injunction will prevail on the merits of its appeal; **(b)** whether the party seeking an injunction pending appeal will suffer irreparable harm or injury unless an injunction is granted; **(c)** whether the other parties interested in the proceeding will suffer substantial harm or injury if an injunction is granted; and **(d)** whether the public interest will be harmed or served by granting an injunction.  *See*, *e.g.*, *Dayton Christian Sch. v. Ohio Civ. Rights Comm'n*, 604 F. Supp. 101, 103 (S.D. Ohio 1984), *rev'd*, 766 F.2d 932 (6th Cir. 1985), *rev'd on other grounds*, 477 U.S. 619 (1986); Wright et al., FEDERAL PRACTICE AND PROCEDURE § 2904.  The court in *Dayton Christian Schools* noted that  "[t]he necessary 'level' or 'degree' of possibility of success will vary according to the court's assessment of the other factors." Id. *See also Mohammed v. Reno,* 309 F.3d 95, 101 (2d Cir.2002) ("The probability of success that must be demonstrated is inversely proportional to the amount of irreparable injury plaintiff will suffer absent the stay. Simply stated, more of one excuses less of the other").

17.     As the Supreme Court held in Winter v. Nat. Res. Def. Council, 555 U.S. 7, 24, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008):

8

> A preliminary injunction is an extraordinary remedy never awarded as of right. *Munaf*, 553 U.S., at 689 – 690, 128 S.Ct., at 2218–2219. In each case, courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Amoco Production Co.*, 480 U.S., at 542, 107 S.Ct. 1396. "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Romero–Barcelo*, 456 U.S., at 312, 102 S.Ct. 1798; see also *Railroad Comm'n of Tex. v. Pullman Co.*, 312 U.S. 496, 500, 61 S.Ct. 643, 85 L.Ed. 971 (1941).

18.     Here, as to Items 2 and 3, the Plaintiffs' proof was lacking that they will suffer irreparable harm or injury by a temporary closure of the Project Area during construction, along with bird nesting deterrence measures that are necessary to mitigate significant public health risks.  The balance of equities and consideration of the overall public interest in this case tip strongly in favor of the City.

19.     As to the remaining factors relevant for deciding the injunction issue, it is clear that the citizens and residents of San Antonio will suffer substantial harm or injury by a delay in commencement of construction.  The public interest will be harmed by the continuation of the significant public health risks cited by the Court, as well as "fettered access" to the entire area.  Clearly the balance of the equities weighs in favor of denying an injunction on appeal.

20.     In their Motion, Plaintiffs continue with the ever-evolving use of the term "Sacred Area."  In the Partial Order [**Dkt. 47**], the Court described a "sacred site" as the area on the Southern Bank (20-foot-by-30-foot rectangular plot out of two acres of land located between two bald cypress trees).  In their Motion, however, Plaintiffs argue that essentially the entire Project Area is the area where the "spiritual ecology" must be preserved.  Thus, Plaintiffs argue, the entire north-shore project needs to be halted.  The Court correctly sorted through the Plaintiffs' various evolving claims, and found a proper

balance. Plaintiffs offered no credible evidence that an alternative design or engineering plan would actually save any trees. The City's findings of fact and conclusions of law that the Court adopted are more than amply supported by the evidence at the hearing.

21. Significantly—for purposes of adjudicating Plaintiffs' Motion [**Dkt. 54**] and assessing their alleged "likelihood of success of the merits" on appeal—the "City's Proposed Findings of Fact and Conclusions of Law and the legal authorities cited regarding Plaintiffs' requested Item 2 and Item 3"—adopted by the Court as its own—confirm the Court's conclusions that the City's conduct at issue in Plaintiffs' requested Item 2 and Item 3 does not offend the First Amendment Free Exercise Clause or the coextensive provision of the Texas Constitution. See **Dkt. 32;** *Employment Div., Dept. of Human Resources of Oregon v. Smith*, 494 U.S. 872, 878-79 (1990); see also *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. ___, ___, 142 S. Ct. 2407, 2421 (2022)(*citing Smith*). The Findings and Conclusions were directly supported by the evidence, and they properly support the Court's rationale and ultimate decision on both Items.

22. The Free Exercise Clause of the First Amendment, moreover, is written in terms of what the government cannot do to the individual, *not* in terms of what the individual can exact from the governments. *Satanic Temple v. City of Belle Plaine*, 2021 WL 4199369, at *13 (D. Minn. Sept. 15, 2021)(also stating that the "First Amendment does not include a constitutional right to use public property as a place of worship"); *see also Taylor v. City of Gary*, 233 F. App'x 561, 562 (7th Cir. 2007)(observing that "the Free Exercise Clause does not give [plaintiff] the right to demand that the City provide him with municipally-owned property as a place of worship"); *Prater v. City of Burnside*, 289 F.3d 417, 427-28 (6th Cir. 2002).

23. Further, First Amendment law is clear that the government has the right to

10

limit conduct on its own property, even if such limitation might also impose limits on the exercise of religion. See, e.g., *Lyng v. Northwest Indian Cemetery Protective Ass'n*, 485 U.S. 439, 447-49 (1988)(rejecting Indian tribes' Free Exercise challenge to the United States Forest Service's approval of plans to construct a logging road in the Chimney Rock area of the Six Rivers National Forest and finding that such conduct did not impose a burden "heavy enough" to violate the Free Exercise Clause); *Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1063 (9th Cir. 2008)(rejecting the claim of multiple Indian-tribe plaintiffs that use of artificial snow made from reclaimed water in a government-owned park on what the Navajo Nation considered a sacred mountain desecrates the entire mountain, deprecates their religious ceremonies, and injures their religious sensibilities, in violation of several federal statutes); *United States v. Means*, 858 F.2d 404 (8th Cir. 1988)(rejecting, on the basis of government's ownership, the Lakotas' claim that the United States Forest Service's denial of a permit for the use of an area in the Black Hills National Forest (federal property), as a religious, cultural, and educational community violated their free exercise rights); *Wilson v. Block*, 708 F.2d 735, 739-40 (D.C. Cir. 1983)(finding no impermissible burden on religious rights despite Navajo and Hopi plaintiffs' contentions that development of the Snow Bowl on the San Francisco Peaks (federal land) would be inconsistent with their First Amendment right to freely hold and practice their religious beliefs on the Peaks, which they believe to be sacred); *Havasupai Tribe v. United States*, 752 F. Supp. 1471, 1484-85 (D. Ariz. 1990), *aff'd sub nom*. *Havasupai Tribe v. Robertson*, 943 F.2d 32 (9th Cir. 1991)(rejecting, on the basis of government's ownership, a Havasupai free exercise violation claim involving the Forest Service's plan for a uranium mine in an Arizona national forest (federal property)); *Manybeads v. United States*, 730 F. Supp. 1515, 1517-18 (D. Ariz. 1989)(rejecting, on

11

the basis of the government's ownership, a Navajo claim that relocation from the Hopi Reservation under the provisions of the Navajo-Hopi Land Settlement Act violated their free exercise rights).

24. The same sort of rule has been applied to park land owned by a state. *See*, *e.g.*, *Crow v. Gullet,* 541 F. Supp. 785, 794 (D. S.D. 1982), *aff'd*, *Crow v. Gullet*, 706 F.2d 856, 858-59 (8th Cir. 1983)(per curiam)(plaintiffs did not show that defendants' development, construction, and regulatory actions burdened plaintiffs' religious exercises in the Bear Butte area, and plaintiffs "failed to establish any infringement of a constitutionally cognizable first amendment right." To the extent their right of access was temporarily restricted at the ceremonial grounds, plaintiffs' interests were "outweighed by compelling state interests in preserving the environment and the resource from further decay and erosion, in protecting the health, safety, and welfare of park visitors, and in improving public access to this unique geological and historical landmark"). No principled analysis would prevent the same sort of rule from applying to land owned by, and under the management of, a home rule municipality such as the City.

25. Indeed, even the Plaintiffs' expert engineer conceded that when presented with competing engineering methods, it is usually the Owner who gets to make the decision. See, Unofficial transcript, pp. 282-83:

> "THE COURT: If two competing engineering companies came up with these plans and we're presenting it to the owner of a property and there are arguably pluses and minuses either method, who gets to make that decision.
>
> THE WITNESS: Usually the owner.
>
> THE COURT: The owner. All right. In this case it appears, at least part of it, that one side is asking the Court to tell the owner which methodology to use, which is neither here nor there as far as your testimony, but it's an issue."

4867-2950-6184, v. 1

26.     The City's Findings of Fact and Conclusions of Law that the Court adopted as its own also confirm that Plaintiffs' alleged claim under RLUIPA fails as a matter of law because Plaintiffs admit that they have no property interest in Brackenridge Park, and Plaintiffs' failure to even mention RLUIPA during the PI Hearing suggests that they have abandoned that claim. While Plaintiffs do not discuss RLUIPA in their Motion, either, they nevertheless rely upon RLUIPA cases in trying to support their argument for injunctive relief.  See, e.g., **Dkt. 54** at 5, 7 (citing *Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 295, 298 (5th Cir. 2012).

27.     While the foregoing points are relevant in their own right, they are also relevant to the Motion because they confirm that Plaintiffs have not—and cannot—satisfy the "irreparable harm" element of a claim for injunction pending appeal by simply pointing to some alleged or feared—but never proven—Constitutional violation.

28.     Plaintiffs now ask the Court to disregard its prior correct rulings and grant Plaintiffs the very same injunctive relief—this time, pursuant to FED. R. CIV. P. 62(d)—to which Plaintiffs never proved themselves entitled during the PI Hearing.  The law does not support Plaintiffs' position, and even if it did—which the City *denies*—Plaintiffs are certainly not entitled to an injunction pending appeal without posting a significant supersedeas-type bond to protect the City from the significant harm it will incur as a result of any such injunction.  If the Court finds that Plaintiffs are entitled to injunction pending appeal they seek, the City respectfully requests a hearing to establish the amount of such bond.

## V. CONCLUSION AND PRAYER

For the foregoing reasons, Plaintiffs have not proven their entitlement to a FED. R. CIV. P. 62(d) injunction pending appeal, and the City respectfully asks that the Court deny

Plaintiffs' Motion and grant the City all other relief to which it may be justly entitled, at law or in equity.

        Respectfully submitted,

        LANGLEY & BANACK, INC.

        BY: */s/ Fred R. Jones*
        FRED R. JONES
        State Bar No. 10886700
        fjones@langleybanack.com
        NATALIE F. WILSON
        State Bar No. 24076779
        nwilson@langleybanack.com
        IAN M. MCLIN
        State Bar No. 24005071
        imclin@langleybanack.com
        LEE WARREN
        State Bar No. 24099453
        lwarren@langleybanack.com
        SARA MURRAY
        State Bar No. 14729400
        smurray@langleybanack.com
        745 East Mulberry, Suite 700
        San Antonio, TX 78212-3166
        Telephone: (210) 736-6600
        Facsimile: (210) 736-6889

        -and -

        CITY OF SAN ANTONIO
        DEBORAH KLEIN
        Deputy City Attorney
        State Bar No. 11556750
        Deborah.Klein@sanantonio.gov
        International Center
        203 S. St. Mary's Street, 2nd Floor
        San Antonio, TX 78205
        Telephone: (210) 207-8949
        Facsimile: (210) 207-4004

        **ATTORNEYS FOR DEFENDANT**
        **CITY OF SAN ANTONIO**

4867-2950-6184, v. 1

## CERTIFICATE OF SERVICE

The undersigned counsel of record hereby certifies that on October 19, 2023, a true and correct copy of the "Defendant City of San Antonio's Response in Opposition to 'Plaintiffs' Emergency Motion for Injunction Pending Appeal [**Dkt. 54**]'" was served via the Court's electronic facilities to the following persons:

MARK W. RASMUSSEN
mrasmussen@jonesday.com
JONATHAN D. GUYNN
jguynn@jonesday.com
CHANCE MCCRAW
cmccraw@jonesday.com
JONES DAY
2727 North Harwood Street
Dallas, TX  75201-1515

**ATTORNEYS FOR PLAINTIFFS**

JOHN GREIL
john.greil@law.utexas.edu
STEVEN T. COLLIS
steve.collis@law.utexas.edu
Law & Religion Clinic
University of Texas School of Law
727 East Dean Keaton Street
Austin, TX 78705

**ATTORNEYS FOR PLAINTIFFS**

　　　　　　　　　　　　　　　　　　　　　　 _/s/ Fred R. Jones_
　　　　　　　　　　　　　　　　　　　　　　　FRED R. JONES

4867-2950-6184, v. 1